## FRANKE v. FRANKE.

### No. 14,532; November 30, 1892.

#### 31 Pac. 571.

Marriage—Proceeding to Annul—Fraud.—Where a man marries a woman whom he has debauched before marriage, and whom he knew to be pregnant at the time of marriage, he cannot have the marriage annulled on the ground that he was deceived by the false assurances of the wife that he was the father of the child, and that she had been chaste to all others, under Civil Code, section 82, providing for annulling marriages where the consent of either party was obtained by fraud.[1]

Marriage—Annulment.—The Fact That the Woman was Pregnant at the time of her marriage is not ground for setting the marriage aside under Civil Code, sections 58, 82, for physical incapacity.

---

[1] Cited and followed in Gondouin v. Gondouin, 14 Cal. App. 288, 111 Pac. 757, the facts in the two cases being similar.

Cited in Thorne v. Thorne, 57 Wash. 442, 135 Am. St. Rep. 995, 107 Pac. 348, construing a somewhat similar statute of Washington, and holding that if a man, lawfully arrested on process for seduction, marries the woman to procure his discharge, he cannot annul the marriage for duress.

Cited and approved in Lyon v. Lyon, 230 Ill. 372, 82 N. E. 852, 13 L. R. A., N. S., 996. In that case annulment was sought by the husband on the ground that the marriage had been entered into through reliance by the plaintiff on the defendant's assurance, found subsequently to be false, that she had had no epileptic fit for eight years. It was held that there was no fraud here such as would justify annulment.

APPEAL from Superior Court, Alameda County; John Ellsworth, Judge.

Action by Rudolph Franke against Wilhelmine Augusta Franke to annul marriage. From a judgment for plaintiff, defendant appeals. Reversed.

R. M. F. Soto, Carroll Cook and J. E. Foulds for appellant; A. A. Moore and Reed & Nusbaumer for respondent.

VANCLIEF, C.—Action to annul marriage, on the ground that plaintiff's consent to marry was obtained by fraud, and upon the further and distinct ground that the defendant was physically incapable of entering into the marriage state. The cause having been tried by the court, judgment was rendered in favor of plaintiff, from which, and from an order denying her motion for a new trial, the defendant has appealed.

The complaint, after stating the marriage on the fifteenth day of September, 1889, generally and meagerly alleges the cause of action as follows: "(3) For the purpose of inducing the plaintiff to consent to the said marriage, the defendant falsely and fraudulently represented that she was chaste and virtuous, and physically competent to marry plaintiff, and concealed from plaintiff her real condition, claiming then to be pregnant by plaintiff, but chaste and virtuous as to all other men, and that, save plaintiff, she had never had sexual intercourse or connection with any man. All which representations were false and fraudulent. (4) That defendant was not then and there physically competent to marry plaintiff, but was at the time of said marriage pregnant by some other man than plaintiff. (5) That plaintiff relied upon said representations, and was induced to consent to the said marriage by the said representations, and, if the same had not been made, and said concealment practiced, he would have never consented to the said marriage. (6) That upon the discovery of the falsity of the said representations the plaintiff ceased to cohabit with the defendant and has never since cohabited with her." The answer of the defendant specially denies that she made the false and fraudulent representations charged, and denies that she was physically incompetent to marry the plaintiff; admits that she was pregnant by the

plaintiff at and before the marriage, and denies that she was so by any other man, and alleges that before the marriage she fully informed the plaintiff of her true condition.

The court found as follows: "(1) That on the fifteenth day of September, 1889, at the city and county of San Francisco, state of California, plaintiff and defendant intermarried. (2) That on or about the twentieth day of April, 1889, plaintiff and defendant had voluntary sexual intercourse with each other, and that on or about the fourteenth day of August, 1889, and at divers other times in said month before the date of said marriage, defendant and defendant's then attorney, James Herrmann, represented to plaintiff that defendant was pregnant and with child by plaintiff, and that she was chaste and virtuous as to all other men, and that she was physically competent to marry plaintiff. (3) That plaintiff, to satisfy himself of the truth or falsity of these representations, did, before his said marriage with said defendant, act as a careful and prudent man should act, and in all respects used due and proper care. (4) That at and after the making of said representations, and at and after the marriage of said plaintiff and defendant, defendant concealed from plaintiff her true condition. That defendant, at and prior to the making of said representations, and at the time of her marriage with said plaintiff, was pregnant, not by plaintiff, but by a man other than plaintiff. (5) That plaintiff, at and after the time of his marriage with defendant, believed in and relied upon the said representations, and in consequence of said representations and belief plaintiff was deceived into and induced to consent to said marriage; and if said representations had not been made, and said concealment of her true condition practiced by defendant upon plaintiff, plaintiff would not have intermarried with defendant. That the said representations, and each and all of them, were untrue and false and fraudulent, and at the time said representations were made by defendant to plaintiff defendant well knew that they were untrue, false, and fraudulent. (6) That defendant, by reason of the fact that she was pregnant by a man other than plaintiff, was at the time she married plaintiff physically incompetent to marry him, and that her concealment from plaintiff of her true condition was a fraud upon plaintiff. (7) That plaintiff did not discover the fraud which had been

practiced upon him by defendant until on or about the twenty-eighth day of October, 1889, and that immediately upon such discovery he ceased to cohabit with defendant, has never since cohabited with her, and acted promptly and with the highest good faith to procure an annullment of his marriage.''

It is claimed by appellant that the evidence is insufficient to justify the findings of fact in several material particulars, and also that the findings do not warrant the judgment. The only evidence of sexual intercourse between the parties before their marriage is the testimony of the plaintiff, which is not fully nor quite fairly represented by the findings, either as to the first time nor the number of times it occurred, or as to the period during which it continued, since these circumstances were material, as we shall see, as bearing upon plaintiff's antenuptial knowledge of defendant's character for chastity. The plaintiff testified that in March, 1889, he was a widower, forty years of age, residing in Oakland, Alameda county, with his family of five children—a son aged fourteen years, a daughter aged eleven years, and three younger children. That the defendant then resided with her parents in San Francisco, and (as appears by other testimony) was only seventeen years of age. That for some time plaintiff had been acquainted with her parents, but had not known the defendant until she came to his house in Oakland, to visit his children, in March, 1889. He did not meet her again until the eighteenth or nineteenth day of April following, when she again visited his children, and remained at his house all night. After playing cards with her and his children until about 9 o'clock that evening, he directed her and his children to retire to bed, which they did, she going to a bedroom with some of the children and he remaining in the sitting-room on a sofa, where he fell asleep. About an hour after defendant had gone to her bedroom she returned to the room where he was sleeping on the sofa, and awoke him by tickling his nose with a feather duster. He then told her ''that was dangerous business, and that she had better go to bed and have nothing to do with it.'' She persisted, however, ''fooling around him and playing,'' and the result was that both went to his bedroom, and there, for the first time, had sexual intercourse, which was repeated the next day about 11 o'clock A. M. Thereafter she visited at his house about once a week, stay-

ing all night and going to his bed. He does not remember how often these visits occurred, but thinks ten or twelve times. They must have continued through the month of May and a part of June. He further testified that on the first occasion he told her he "was afraid of the business," and that she said: "You needn't be afraid; that is all right; I have got my protector" (meaning her beau). As a matter of precaution, however, he used what he called "a protector," to prevent conception, which he seems to have had at hand on the first occasion, but which he says was not successful about the third time it was used, and within the month of April. The use of this instrument is one of the reasons assigned by him for doubting, at the time of the marriage, that he was the father of the child.

On August 22, 1889, the defendant—then Miss Bruhn, and still a minor—by her guardian, Peter F. Bruhn, her father, commenced an action against the plaintiff herein to recover $50,000 damages for seduction, alleged to have been accomplished on the eighteenth day of March, 1889. It appears that plaintiff herein had notice that defendant was pregnant, and claimed that he was the father of the child, before the action for seduction was commenced, but it does not appear by what means he was notified nor that any demand had been made upon him either to marry or pay damages before the commencement of that action. Nor does it appear that he was ever requested by defendant or her parents to marry her. He testified that he called upon her at her father's house a day or two after the action for seduction was commenced and complained that no effort had been made to settle the matter quietly with him before commencing the action, and that she then said she had not advised the action, and that her father had commenced it without her approval. He then told her in the presence of her mother that if he was the father of the child, he was willing to marry her, and "that they had no business to go to law about it." Plaintiff further testified that the defendant first told him that he and no other man was the father of the child at her lawyer's office, on the day they got their marriage license (September 15th), and that her lawyer—Mr. Herrmann—then made her swear to it; and that her lawyer promised that if the time of the birth of the child should not correspond with plaintiff's reckoning, he

(the lawyer) "would get plaintiff free without a cent.". It also appears that while the seduction suit was pending the plaintiff therein and her lawyer offered to settle and dismiss the suit for $1,300 if plaintiff was not content to marry. He preferred to marry, though, he said, he always doubted that he was the father, rather than "throw money away" in payment of alleged damages. The child was born October 27th, six months and nine days after the first admitted act of coition, and one month and twelve days after the marriage, and, in the opinion of medical witnesses, had the appearance of a child not prematurely born. These circumstances, with the testimony of plaintiff as to the time of his first intercourse with defendant, must be regarded as sufficient to justify the findings that plaintiff was not the father of the child, and that defendant's representations before marriage that she had been virtuous as to all other men than plaintiff were willfully false. Yet, considering her age and inexperience, she may not have known before marriage that plaintiff was not the father, though for good reasons she may have doubted that he was. But assuming, as we must, that the finding that he was not the father is true, she willfully asserted what she did not know to be true, and what she had good reason to doubt, at least; and to this extent the finding that "she well knew" that her representation that plaintiff was the father "was false and fraudulent" should be qualified. The finding that plaintiff and defendant had sexual intercourse "on or about the twentieth day of April, 1889," should also be qualified and characterized by the circumstances of the intercourse shown by the testimony of the plaintiff; otherwise, material traits and features of the character of that intercourse are hidden from view. The comparative ages and experience of the parties, his relation to her as a visitor of his children at his house, the conduct of both parties on the first occasion, the frequency of the intercourse, the length of time it continued, and the absence of any pretense of virtue on her part while it continued, are material, as tending to show her then apparent character for virtue, the extent to which he was particeps criminis in her incontinence, and that he had not sufficient reason to be deceived by her false representations made to him for the first time on the day he procured the marriage license.

But, accepting the findings as they appear in the record, I think they do not warrant the judgment on the ground of fraud. The Civil Code, section 82, provides that a marriage may be annulled on the ground ''that the consent of either party was obtained by fraud.'' The only case in this state in which a marriage has been annulled on this ground is that of Baker v. Baker, 13 Cal. 88. In that case the defendant (wife) was pregnant by a stranger at the time of marriage, but the husband had no sexual intercourse with her, or any other reason to suspect her chastity, before marriage, and did not know or suspect that she was pregnant at the time of marriage; whereas, in this case the plaintiff participated in the incontinence of his wife before marriage, and also knew her to be pregnant at the time of marriage, and even then doubted, as well he might, that he was the father. Our Civil Code does not define the kind or degree of fraud required to annul a marriage, but no one will contend that every kind and degree of fraud which would be sufficient to annul an ordinary contract would also be sufficient to annul a marriage contract, consent to which had been induced by it. Under these circumstances, it is proper to consult the decisions of the highest courts of other states construing similar statutes: Bishop on Marriage and Divorce, sec. 496. Statutes of other states similar to sections 58 and 82 of our Civil Code, authorizing the nullification of marriage on the ground of fraud simply, without defining the kind or degree of the fraud, have been uniformly construed as being merely jurisdictional, and to mean that kind of fraud defined by the unwritten law applicable to marriage contracts (Bishop on Marriage and Divorce, secs. 475, 478; Foss v. Foss, 12 Allen (Mass.), 26; Scroggins v. Scroggins, 3 Dev. 535) ; and under such statutes it has been held almost uniformly that where a man marries a woman whom he has debauched before marriage, and whom he knew to be pregnant with child at the time of marriage, the marriage will not be annulled on the ground that he was deceived by the false assurances of the wife before marriage that he was the father of the child, and that she had been chaste with all other men. Having experienced and participated in her incontinence before marriage, he is thereby sufficiently apprised of her want of chastity to deprive him of the right to complain that he was deceived by her false assurances that

he was the only participant in her illicit intercourse: Reynolds v. Reynolds, 3 Allen (Mass.), 609; Foss v. Foss, 12 Allen (Mass.), 26; Crehore v. Crehore, 97 Mass. 330, 93 Am. Dec. 98; Scroggins v. Scroggins, 3 Dev. 535; Long v. Long, 77 N. C. 305, 24 Am. Rep. 449; Carris v. Carris, 24 N. J. Eq. 517; Seilheimer v. Seilheimer, 40 N. J. Eq. 412, 2 Atl. 376; Varney v. Varney, 52 Wis. 120, 38 Am. Rep. 726, 8 N. W. 739; Bishop on Marriage and Divorce, sec. 483 et seq.

The only authority for any exception to the rule, as above stated, which I have been able to find is to be found in the extreme cases of Barden v. Barden, 3 Dev. 548, and Scott v. Shufeldt, 5 Paige Ch. (N. Y.) 43, in each of which the parties were white and the child begotten before marriage was a mulatto. Each of these cases was decided upon the facts stated in the complaint, and upon a demurrer. In the first, Ruffin, J., who delivered the opinion of the court, expressly characterized his concurrence in it as ''a concession to the deep-rooted and virtuous prejudices of the community upon the subject.'' Another distinguishing attribute upon which the exception is said to have been grounded is that ''the blood of the woman, as physiologists tell us, has been tainted by mingling with that of the first (mulatto) child, and she is incapable of bearing children that will not show the mixture of African blood'': See dissenting opinion of Rodman, J., in Long v. Long, 77 N. C. 304, 24 Am. Rep. 449. In each of those cases the mulatto child had been born before the marriage, but the putative father, in one case, had not seen it, and in the other had not discovered that it was a mulatto until after marriage. In the New York case (Scott v. Shufeldt) the court said: ''If the child had not been born at the time of the marriage, the complainant would have had some difficulty in showing that he had been intentionally deceived and defrauded by the defendant, as she might possibly have supposed the child to be his, although she had also had connection with a negro about the same time.'' Possibly other extremely hard cases may occur sufficiently distinguishable from the cases above cited to justify additional exceptions to the rule, but such cases need not be anticipated, since this case certainly is not one of them.

So far as plaintiff's alleged grievance is founded upon fraud, the substance of it is, according to his own testimony,

that at the mature age of forty years, after a matrimonial experience during which five children were born to him, he was seduced by a girl aged seventeen years—the daughter of a neighbor—while visiting his children at his own house, and therefore virtually under his protection, and whom, indeed, he says, he endeavored to protect from the natural consequence of her indiscretion, so far as he could, in his then helpless condition, by the use of a "protector," which it seems he had prudently provided for such an occasion. Nevertheless she afterward claimed that such natural consequence had not been averted, and brought suit against him for seduction, falsely charging that he was the father of her unborn child, and praying judgment for damages. That, rather than "give money away" in settlement of that suit, he elected to marry her on her assurance that he was the father, and the further assurance of her attorney that if the time of the birth of the child should not correspond with plaintiff's reckoning, the attorney would get him free "without a cent"; though at the time of the marriage he doubted that he was the father of the child, and although by postponing the nuptials two months he might have verified his reckoning. The whole substance of the fraud proved consisted of her false representations that she had been chaste with all other men than plaintiff, which, under the circumstances of this case, partly on grounds of public policy, has been deemed insufficient in degree to warrant the annulment of a marriage. The reasons for the rule are fully set forth in the case above cited.

The finding that defendant was physically incompetent to marry the plaintiff is not justified by the evidence, as there is no evidence tending to prove that she was diseased or defective in physical organization. This ground for annulment of marriage, as expressed in sections 58 and 82 of the Civil Code, is entirely distinct from that of fraud. It consists solely of such physical defect or incurable disease existing at the time of marriage as will prevent sexual coition: Bishop on Marriage and Divorce, secs. 757, 766, 768. The case of Baker v. Baker, 13 Cal. 88, has no bearing whatever upon the question of physical incapacity as a cause for the annulment of a marriage. That was an action for a divorce on the sole ground of fraud, and the judgment of the appellate court was placed upon that ground alone, in accordance with the fifth

subdivision of section 4 of the act of March 25, 1851 (Wood's Dig., 1st ed., p. 491), which section also made "natural impotence, existing at the time of marriage," a cause of divorce; but there was no pretense of such impotence in that case; nor was there any statute in this state, prior to the decision in that case, providing for the annulment of a marriage on the ground of physical incapacity. The case of Baker v. Baker was considered in Carris v. Carris, supra, 24 N. J. Eq. 522, and construed as being consistent with the decision in the latter case. I think the judgment should be reversed and the cause remanded for a new trial.

We concur: Haynes, C.; Belcher, C.

PER CURIAM.—For the reasons given in the foregoing opinion the judgment and order are reversed.