Argued March 15, affirmed April 19, 1921.

## WESTFALL *v.* WESTFALL.

(197 Pac. 271.)

**Marriage—In a Suit to Annul, Evidence Held to Show Plaintiff Knew of Defendant's Pregnancy at Time of Marriage.**

1. In a husband's suit to annul a marriage for wife's fraud in concealing the fact that at time of marriage she was pregnant by another, evidence *held* to show that plaintiff knew of such fact at time of marriage, having previously sought to have an abortion performed.

---

1. Concealment of unchastity as ground for annulment of marriage, see note in Ann. Cas. 1914C, 1291.

Marriage—Sexual Commerce Between Husband and Wife Prior to Marriage Held Bar to Suit for Annulment for Fraud.

2.  In a husband's suit under Sections 503, 9722, Or. L., to annul a marriage for wife's fraud in concealing her pregnancy by another, where the evidence showed sexual intercourse between parties prior to the marriage, the husband was precluded from relief by general rule of law that sexual commerce between man and woman before marriage bars suit for relief for such fraud regardless of the paternity of offspring.

Marriage—Equity will not Annul a Marriage for Wife's Concealment of Pregnancy Where the Parties have Intercourse Before Marriage.

3.  Where plaintiff, twenty-six years old, has sexual intercourse with delinquent girl of seventeen, and later weds her, and four weeks after marriage a child is born, he cannot come into a court of conscience and obtain annulment by alleging fraud by reason of concealment of her pregnancy from him.

Divorce—Will be Decreed Only by Proper Authority Because Divorce is to the Public Detriment.

4.  Divorce, being *prima facie* to the public detriment, it is suffered only in those special cases where it is decreed by proper authority.

Bastards—Testimony of Either Husband or Wife will not be Received to Overcome Presumption of Legitimacy of Offspring.

5.  The presumption of law that a "child born in lawful wedlock, there being no divorce from bed or board, is legitimate" (Section 799, paragraph 32, Or. L.), is not overcome by wife's admission of sexual intercourse with another, and "that the issue of a wife cohabiting with husband who is not impotent is legitimate" is made a conclusive presumption by Section 798, paragraph 6, and testimony of neither wife nor husband is competent to overcome presumption of legitimacy.

Marriage—Evidence Held Insufficient for Annulment.

6.  In a suit to annul a marriage for wife's concealment of pregnancy, evidence independent of the presumption of legitimacy of child born in lawful wedlock, and other presumptions in favor of defendant, *held* not to make out a case for annulment.

From Yamhill: HARRY H. BELT, Judge.

Department 1.

In this proceeding the plaintiff seeks relief in a court of equity, for the annulment of the marriage contract with defendant, on the ground of fraud.   He

---

5.  Admissibility of evidence of illicit intercourse by mother of child born in lawful wedlock on issue of its legitimacy, see note in Ann. Cas. 1916A, 1187.

complains that at the time of marriage defendant was. pregnant with child, which fact she concealed. Briefly, the facts are:

Harvey A. Westfall, of the age of 26 years, plaintiff and appellant, on the thirteenth day of January, 1920, married Florence Elma Wood, 17 years of age. A girl babe was born to the wife on February 12, 1920. Plaintiff cared for her for eight days thereafter, and she was then taken to her father's home. Her husband forthwith instituted divorce proceedings in the Circuit Court of the State of Oregon in and for Yamhill County.

Plaintiff alleges, among other things, that "plaintiff and defendant, with the consent of the defendant's mother, were legally married to each other; that in May, 1919, the defendant became pregnant with child by one P. Ditmar, and was pregnant with child at the time of the engagement and marriage of the plaintiff and defendant; that plaintiff was entirely ignorant of such fact, and the defendant fraudulently concealed the fact from plaintiff, but led him to believe that she was a girl of good character; that thereafter, and on the twelfth day of February, 1920, the defendant gave birth to a fully developed girl baby; that after the birth of the child, defendant admitted to plaintiff that one P. Ditmar was its father, and that she had con-. cealed the fact of her pregnancy from the plaintiff."

The defendant, answering, "admits that she was pregnant with child at the time of the engagement and marriage of the plaintiff and defendant," but she alleges "that the plaintiff had full and complete knowledge of all the facts and circumstances connected with said pregnant condition of the defendant prior to their marriage."

The record shows that after they were married they stayed at her mother's abode for a few nights, but thereafter lived at his father's home with his father's family, consisting of his mother, two sisters and a brother; that the wife became ill on the night of February 12, 1920; that a doctor was called; that on his arrival the doctor made an examination and told plaintiff a child was about to be born; that no preparation had been made by way of clothing, or otherwise, for the advent of the child.

Plaintiff and defendant testified that they commenced keeping company in September, 1919, and that he visited her frequently until the time of their marriage. Plaintiff further testified that after marriage he slept continuously with his wife and had sexual intercourse with her until within a week prior to the birth of the baby, and entertained no suspicion of her pregnancy. He claimed that his first knowledge of her pregnancy by Ditmar was an hour after the child was born.

Plaintiff's mother and sister testified that about one hour after the birth of the baby the defendant "begged him [plaintiff] to knock her [defendant] in the head for deceiving him''; that after hearing this they promptly went on their way to rest. Defendant stoutly denies making such statement, and says that she was under the influence of chloroform, and remembered nothing until about 6 o'clock A. M.

Defendant testified that her seventeenth birthday was in July, 1919; that she commenced keeping company with plaintiff in September thereafter; that he first took her to the State Fair; afterwards to McMinnville; that they had sexual intercourse prior to her promise to marry him; that he visited her frequently; that he proposed marriage; that prior to

their marriage she told him of her relations with Ditmar, which occurred in the month of May, 1919, when she was a school girl of the age of sixteen years; that she told the plaintiff of her delinquency because she thought he should know. She testified:

"I told him I thought I was pregnant, and told him of my relations with Ditmar. He said it [pregnancy] would have showed up if it had been Ditmar's. It had been too long since I had been going with Ditmar.

"Q. What, if any reason did you give him that you thought you were pregnant from Ditmar at that time?

"A. I thought if I was pregnant with Ditmar I didn't think he would want me.

"Q. What reason, if any, did you give him why you thought you were pregnant?

"A. Because I had had no menses since October.

"Q. Did you tell him that?

"A. Yes.

"Q. What did he say?

"A. He said if it had been Ditmar's it would have showed up before that.

"Q. What else before you promised him * * did he make you promise?

"A. That I would be true to him, to Harvey.

"Q. You couldn't state, if you know, how many times approximately your husband Harvey Westfall had sexual intercourse with you prior to your marriage?

"A. Several.

"Q. Now, why were you married when you were?

"A. Because I thought I was pregnant from him."

She testified that plaintiff said it better to wait until spring, while she believed that the sooner they were married the better on account of her condition, but thought her pregnancy was due to Harvey. She further testified that before the child was born she told her husband that if it was a nine-months' baby it was Percy Ditmar's; that after the baby came he

put his arms around her, kissed her, and, as is admitted by all, slept with her during the eight days that she remained in the house of his father after the birth of the child. She further testified that prior to their marriage plaintiff made a visit to Dr. Wood of McMinnville for the purpose of having an abortion committed upon her body; that plaintiff told her upon his return that he "went to see Old Doc Wood," who said "it would be a penitentiary offense for both of them and he didn't do that kind of work;" that she didn't have to change her dressing in any way prior to the birth of the child on account of being pregnant and that she was "able to work and move about in the same manner that she was prior to that time;" that she wore a corset but did not lace it, and had no symptoms of pregnancy prior to October; also, that she did not expect the child before June.

Dr. J. T. Wood, a physician of McMinnville, testified, upon the part of defendant, that the plaintiff came to him in November or December, 1919, and that:

"He told me he was in trouble with some girl; he didn't tell me what girl or anything about it; he said it was a girl, and that they thought a lot of each other, and that sort of thing, and were not ready to get married, and wanted to know if I could help them out of such a case.

"Q. What did you tell him?

"A. I told him I couldn't do that; I didn't think it was the best thing, even if he had it done somewhere else; I told him the best thing to do was to marry the girl. If he liked the girl and was satisfied he was responsible for her condition, the best thing was to go and marry her. * *

"The Court: Do you feel positive now in your remembrance of this thing that he mentioned anything about marriage?

"A. Now, I will put it this way, Judge. I think that he mentioned they expected to get married; anyway, I told him that was the best thing to do.

"The Court: You are positive of that?

"A. Oh, I know that. Toward the end of the thing he said, 'I suppose your advice is best. * * ' I wouldn't positively swear he said first he intended to marry, or it was after I suggested he should marry her, but he did say he intended to marry the girl but was not yet ready to marry her."

Defendant's mother testified that after the birth of the child she said to plaintiff: "Harvey, did you know about this?" and he said: "Yes, but I didn't think it would be quite so soon."

"Q. What were you speaking about when you said, 'Did you know this'?

"A. I was speaking about the baby."

Plaintiff admitted that he called upon Dr. Wood for the purpose of arranging for an operation, and testified that the doctor refused, saying that it would be a penitentiary offense for each. He said, however, that it was not for the purpose of having a criminal operation performed upon the defendant, but upon a female relative.

"Q. What girl was it for?

"A. For a near relative of my family that is now in the Feeble-minded Home."

Pregnancy occurred in May and defendant testified that she ceased menstruating in October. The lower court thought this fact important and admitted expert medical evidence concerning the likelihood of her story. Plaintiff's physician, being recalled at the request of the court, testified:

"There are lots of women who will be five months pregnant and not realize that they are pregnant."

He also testified that:

"A few women will menstruate throughout the period occasionally; that is exceptional; and frequently they will menstruate for two or three months and occasionally for five or six months through the period."

Among the facts found by the court are the following:

"That the plaintiff is of the age of 26 years and the defendant of the age of 17 years.

"That heretofore, to wit, on the fifteenth day of January, 1920, at McMinnville, Yamhill County, Oregon, the plaintiff and the defendant, with the consent of the defendant's mother, were lawfully married to each other, and ever since have been, and now are, lawful husband and wife.

"That the defendant was and is not guilty of any fraud, fraudulent representation, fraudulent concealment, or deceit practiced upon the plaintiff, and that plaintiff's engagement and marriage to the defendant was made and executed by the plaintiff with full and complete knowledge of all the facts and circumstances surrounding and connected with the condition of the defendant with reference to pregnancy before the marriage of plaintiff and defendant, the plaintiff having full knowledge of defendant's pregnant condition in November, 1919, at the time of the engagement of plaintiff and defendant to marry.

"That prior to the marriage of plaintiff and defendant, the plaintiff had sexual intercourse with the defendant."

From a decree based upon the findings of fact and conclusions of law, dismissing plaintiff's suit, he appealed to this court, assigning as error:

"That the court erred in dismissing plaintiff's suit.

"That the court erred in not annulling the marriage on the grounds of fraud practiced upon the appellant."

AFFIRMED.

For appellant there was a brief with oral arguments by *Mr. Frank Holmes* and *Mr. E. V. Littlefield.*

For respondent there was a brief over the name of *Messrs. Vinton & Tooze,* with an oral argument by *Mr. Walter L. Tooze, Jr.*

BROWN, J.—We have set down the facts at some length in the statement for the reason that this case is out of the ordinary. The contradictory statements of plaintiff and defendant raise questions of veracity. Whom shall we believe? It has been written that:

"There is no standard by which the weight of conflicting evidence can be ascertained."

If the controlling facts in the case at bar are fully comprehended, the application of the law presents no serious problem. Plaintiff charges his wife with pregnancy by a third person at marriage, and with concealment. Defendant admits pregnancy, but denies concealment. Plaintiff was a man 26 years old at the time of his marriage. The girl was 17 and a delinquent child under the statute of this state, because of the fact that when a school girl she morally slipped, by having improper relations with one P. Ditmar, a young man of the neighborhood. She, likewise, had had intercourse with the plaintiff. She says, and it is possible, that conception took place without her knowledge. Nature delayed in evidencing its warning until October, when her menses ceased. Expert medical testimony of record corroborates the probability of the girl's story. Prior to the appearance of symptoms of pregnancy, she kept company with plaintiff, and had sexual commerce with him. Some time after the passing of the month of October, plaintiff proposed marriage. Defendant advised him of her fears as to her condition. Plaintiff insisted that he did not

believe the child could be Ditmar's, who she admitted had seduced her, on account of her menses not ceasing prior to October. At any rate he knew, or had good reason to know, that the girl whom he married was pregnant with child. By his own act of carnal knowledge of that girl who was at that time 17, Westfall committed the crime of contributing to the delinquency of a minor, in flagrant violation of the provisions of our Criminal Code, Section 2150, Or. L. He also committed a crime by attempting to procure an abortion to be performed upon her. Beyond all question he sought the services of a physician for the purpose of killing an unborn babe. The physician swore to the fact, plaintiff's wife testified to it, and he admitted it. However, Westfall seeks to explain away that damaging circumstance by stating, in substance, that he wished the criminal operation performed, not upon the body of his betrothed, Elma Wood, but upon the body of "a feeble-minded female relative." The physician further testified that the plaintiff gave no names, but led him to understand that—

"He was in trouble with some girl; * * that they thought a lot of each other, * * but were not ready to get married."

That girl was Elma Wood, and not his relative.

1. Based upon the evidence of record and the motives that actuated Harvey Westfall, the plaintiff, we are convinced that the proof fairly establishes the fact that he knew, as the defendant says he knew, that she was carrying a child in her womb, and that he went deliberately to the physician with the premeditated purpose of having him to take the life of that unborn babe. This is but another one of the ten thousand thousand instances wherein guilt, in at-

tempting to conceal guilt, has supplied the evidence
for its own condemnation.

They married in January, 1920, instead of the fol-
lowing spring, on account of the fact that the de-
fendant was pregnant. The circumstances show that
it is reasonably certain that neither the plaintiff nor
the defendant expected the child at the time of its
birth. No preparations whatever had been made for
the arrival of the baby. They looked forward to a
later date, when they would be living in their own
home. The plaintiff perhaps thought it was his child;
the defendant hoped so. Under our view of the law,
in light of the facts in the instant case, whatever the
defendant or plaintiff might have thought about the
matter, he is effectually barred from having his mar-
riage contract annulled.

2. Plaintiff's ground of suit is alleged fraud, and
is based upon the following provision of our Code:

"When either party to a marriage shall be inca-
pable of making such contract or assenting thereto, for
want of legal age or sufficient understanding, or when
the consent of either party shall be obtained by force
or fraud, such marriage shall be void from the time
it is so declared by the decree of a court having jur-
isdiction thereof." Section 503, Or. L.

—and a similar statute denominated Section 9722,
Or. L.

The facts in this case bring the plaintiff, Harvey
Westfall, squarely within a well-established principle
of law that bars his suit. He is precluded from ob-
taining a divorce from his wife by a general rule of
law that sexual commerce between a man and a woman
before marriage bars a suit for divorce on the ground
of fraud by the woman on account of concealment of
her pregnancy, regardless of the paternity of the off-

spring: 1 Bishop on Marriage, Divorce and Separa-
tion, § 498; 14 Cyc., pp. 595, 596; 19 Am. & Eng.
Ency. of Law (2 ed.), 1185; 18 R. C. L., p. 414, § 37;
19 C. J. 39, 40. To the same effect is a note by
Freeman, 79 Am. St. Rep., p. 372, containing a col-
lection of cases holding when antenuptial pregnancy
does, and when it does not, constitute grounds of
fraud sufficient to dissolve the marriage contract:

"Antenuptial pregnancy by another man is, if con-
cealed from the husband, such a fraud upon him as
will justify an annulment of the marriage: *Sinclair* v.
*Sinclair,* 57 N. J. Eq. 222 (40 Atl. 679); *Carris* v.
*Carris,* 24 N. J. Eq. 516; *Donovan* v. *Donovan,* 9
Allen, 140; *Reynolds* v. *Reynolds,* 3 Allen, 605; *Har-
rison* v. *Harrison,* 94 Mich. 559 (34 Am. St. Rep. 364,
54 N. W. 275); * * But, if he, himself, has had im-
proper relations with the wife before marriage, he
cannot have the marriage annulled on account of his
wife's false representations that she was pregnant
by him: *Tait* v. *Tait,* 23 N. Y. Supp. 597 (3 Misc
Rep. 218); or by reason of the fact that she was preg-
nant by another man, although the husband was
ignorant of her condition at the time of the marriage:
*Seilheimer* v. *Seilheimer,* 40 N. J. Eq. 412 (2 Atl.
376); *States* v. *States,* 37 N. J. Eq. 195; *Foss* v. *Foss,*
12 Allen, 26; *Crehore* v. *Crehore,* 97 Mass. 330 (93
Am. Dec. 98); *Carris* v. *Carris,* 24 N. J. Eq. 516."

To the proposition sustaining the general rule, as
stated, also see the cases of *Franke* v. *Franke,* 3 Cal.
Unrep. 656 (31 Pac. 571, 18 L. R. A. 375); *Scroggins*
v. *Scroggins,* 14 N. C. 535; *Long* v. *Long,* 77 N. C.
304 (24 Am. Rep. 449); *Hoffman* v. *Hoffman,* 30 Pa.
417; *McCulloch* v. *McCulloch,* 69 Tex. 682 (7 S. W.
593, 5 Am. St. Rep. 96). To like effect is a note by
the editors of Ann. Cas. 1914C, 1291, and a collection
of the cases bearing upon the subject.

Some authorities recognize exceptions to the gen-
eral rule. As illustrative of such exceptions, we take

this statement from Bishop, on Marriage, Divorce and Separation, at Section 501:

"Thus, where at the time of the solemnization of a marriage between two white persons the child had actually been born and the woman knew it to be a mulatto, yet swore it upon the white man, * * to avoid which process, under the belief of being the father, he consented to marry her, the marriage was set aside as procured by fraud."

As further illustrating the exceptions are opinions based upon statutory provisions providing that concealed pregnancy of a woman by another is ground for divorce. Virginia, Maryland and Iowa, and possibly other states, have such statutory provisions. Section 3175, Iowa Code, provides:

"The husband may obtain a divorce from the wife * * when the wife at the time of the marriage was pregnant by another than the husband, of which he had no knowledge, unless such husband had an illegitimate child or children then living, which at the time of the marriage was unknown to the wife."

A valuable case exemplifying the exception provided by the statutory provision is *Wallace* v. *Wallace,* 137 Iowa, 37 (114 N. W. 527, 126 Am. St. Rep. 253, 15 Ann. Cas. 761, 14 L. R. A. (N. S.) 544. In that case, based upon the statute, the court held that antenuptial sexual intercourse between husband and wife would not prevent a divorce on the ground of her pregnancy by another at the time of marriage, where he had been wrongfully induced by the wife to believe that her condition was the result of his intercourse. However, a divorce was denied in consequence of the presumption that a child born at any time during wedlock is legitimate, together with the rule of evidence relating to paternity, providing that neither the declarations nor the testimony of either spouse is competent on

the question of access or nonaccess of one to the other.

3. A licentious man cannot call upon a court of equity as a guarantor of the paternity of a child conceived in the lewdness of antenuptial intercourse. Here we have a case where the plaintiff, 26 years of age, has sexual intercourse with a delinquent girl of 17, later weds her, and four weeks after marriage a child is born. He then comes into a court of conscience and alleges fraud by reason of concealment of her pregnancy from him, and seeks the dissolution of the marriage contract. Marriage shall not be made a mockery, to shield the licentious from acts penalized by law, and then annulled when it has served his purpose. The union of man and woman by marriage constitutes the foundation of the home. The home is the bulwark of human society, the sure support of law, order and good government. The granting of a decree of divorce dissolving the marriage contract is a grave judicial act. The court should see that in such cases there is "neither levity nor collusion." However, the state expresses its public policy by statutory enactments, and provides for the dissolution of the marriage contract for given reasons. This court will not undertake to enlarge upon the statutory grounds.

4. An eminent authority has written that:

"Marriage being the source of population, of education, of domestic felicity,—being the all in all without which the state could not exist,—it is the very highest public interest. *Prima facie*, therefore, each particular marriage is beneficial to the public; each divorce, prejudicial."

Hence, a divorce "being *prima facie* to the public detriment, it is suffered only in those special cases in which it is decreed by proper authority." 1 Bishop on Marriage, Divorce and Separation, §§ 38, 39.

5. As we deduce the facts from the testimony in this case, the statute and judicial precedent require that a decree of divorce be denied to the plaintiff.

By statutory enactment it is a presumption of law, although disputable, "that a child born in lawful wedlock, there being no divorce from bed or board, is legitimate": Section 799, subd. 32, Or. L. This presumption is not overcome by the admission of the wife that another has had sexual intercourse with her: *Wallace* v. *Wallace,* 137 Iowa, 37 (114 N. W. 527, 126 Am. St. Rep. 253, 15 Ann. Cas. 761, 14 L. R. A. (N. S.) 544).

It is a well-established principle of law that:

"Born in wedlock, the presumption of the legitimacy of the child obtains, even though it happens so soon after marriage as to render it certain that it was the result of coition prior thereto. * * In other words, antenuptial conception does not weaken the presumption of legitimacy arising from postnuptial birth": *Wallace* v. *Wallace,* 137 Iowa, 37 (114 N. W. 527, 126 Am. St. Rep. 253, 15 Ann. Cas. 761, 14 L. R. A. (N. S.) 544), and authorities therein noted; 8 Ency. of Ev., p. 106, and authorities cited in note 6.

"That the issue of a wife *cohabiting* with her husband, who is not impotent is legitimate," is made a conclusive presumption by our Code, Section 798, paragraph 6. While there is respectable authority to the contrary, it is held by the great weight of judicial precedents that the testimony by either the wife or the husband, of the nonaccess of the husband, is not competent evidence to overcome the presumption of legitimacy. The rule is thus stated by Bishop:

"Though husband and wife are competent witnesses to their marriage, yet on 'the broad ground of general public policy affecting the children born during the marriage, as well as the parties themselves,' the courts, on a question of legitimacy, will not permit

them, or one of them after the death of the other, to testify whether or not they had carnal access to each other during the period within which the child must have been begotten. And this rule applies as well to an alleged intercourse before marriage, where the birth was after, as to the ordinary case.''

It is said by Jones, in his valuable work on Evidence:

''It is well settled on grounds of public policy, affecting the children born during the marriage, as well as the parties themselves, that the presumption of legitimacy. as to children born in lawful wedlock cannot be rebutted by the testimony of the husband or the wife to the effect that sexual intercourse has or has not taken place between them; nor are the *declarations* of such husband or wife competent as bearing on the question. The rule not only excludes direct testimony concerning such intercourse, but all testimony of such husband or wife which has a tendency to prove or disprove legitimacy; for example, it was held incompetent to ask the husband, for the purpose of proving nonaccess, whether at a given time he did not live a hundred miles away from his wife and whether at that time he was not cohabiting with another person. Testimony of either party even *tending to show nonintercourse,* or of any fact from which nonaccess may be inferred, or of any collateral facts connected with the main fact, should be scrupulously excluded, and if the illegitimacy is to be proved, it must be proved by other testimony.''

From Greenleaf, we carve the statement that:

''The husband and wife are alike incompetent witnesses to prove the fact of nonaccess.'' 2 Greenleaf on Evidence (16 ed.), § 151; 3 Am. & Eng. Ency. of Law (2 ed.), 879.

To the same effect are: *Estate of Mills,* 137 Cal. 298 (70 Pac. 91, 92 Am. St. Rep. 175); *Shuman* v. *Shuman,* 83 Wis. 250 (53 N. W. 455); *Rabeke* v.

*Baer,* 115 Mich. 328 (73 N. W. 242, 69 Am. St. Rep. 567, and note).

6. But, independent of the aid of presumptive evidence with which the law clothes the defendant in the case at bar, the plaintiff has failed to establish his cause, and this case must be affirmed.   AFFIRMED.

JOHNS, McBRIDE and HARRIS, JJ., concur.

---

Motion to dismiss appeal filed February 5, denied March 2, 1920.
(On the merits, see *ante*, p. 59.)