**PINKARD et al. v. PINKARD.    (No. 966.)**

(Court of Civil Appeals of Texas. Beaumont. May 3, 1923.)

1. **Bastards ⬤⇒3—Child born during wedlock presumed legitimate; antenuptial conception does not weaken presumption.**

A child born during lawful wedlock is presumed legitimate, and antenuptial conception does not weaken the presumption arising from postnuptial birth.

2. **Bastards ⬤⇒6—Evidence held insufficient to establish the illegitimacy of a child born during wedlock, though antenuptially conceived.**

Evidence *held* insufficient to bastardize a child born in wedlock on the ground of nonaccess, where at marriage pregnancy was five months advanced and the alleged father, being already the father of seven children, must have been cognizant of the condition, and where he acknowledged the mother as his wife and lived with her until the birth of the child.

3. **Bastards ⬤⇒5—Declarations of neither husband nor wife are admissible to establish illegitimacy of child born during wedlock.**

Declarations of neither husband nor wife are admissible to establish illegitimacy of child born during wedlock.

4. **Appeal and error ⬤⇒931(1)—Where findings of fact and conclusions of law not filed, findings to support judgment presumed made.**

Where no findings of fact or conclusions of law are filed, it must be presumed that findings to support the judgment were made.

5. **Appeal and error ⬤⇒931(6)—Lower court presumed not to have considered improper testimony or made findings thereon.**

Lower court presumed not to have considered improper testimony or made findings thereon.

6. **Bastards ⬤⇒6—To bastardize child born in wedlock on grounds of nonaccess, evidence must be most clear and conclusive.**

To bastardize a child born in lawful wedlock, the most clear and conclusive evidence of nonaccess is required, and the nonaccess may be shown by circumstances; circumstances that only tend to show improbability of access are not sufficient.

Appeal from District Court, Limestone County; A. M. Bláckman, Judge.

Suit by Gladys Pinkard, by her mother as next friend, against Osmund Pinkard and other. Judgment for plaintiff, and defendants appeal. Affirmed.

W. T. Jackson and James Kimbell, both of Groesbeck, for appellants.

Seay & Bush, of Groesbeck, for appellee.

O'QUINN, J. Suit by Gladys Pinkard, by her mother as next friend, against appellants, seven in number, for the partition of a tract of 126 acres of land, alleging that she and appellants were the sole joint owners of said

land. Appellants answered by general denial, plea of not guilty, and specially denied that appellee was a child of Lee Pinkard, deceased, through whom, as children, all parties claimed, and hence that she was not entitled to any portion of the land.

The case was tried before the court without a jury, and judgment rendered finding that appellee and appellants were the sole joint owners of the land, one-eighth each, and ordered that the land be partitioned, and the court appointed commissioners to partition said land, who afterwards reported that the land had been by them equitably partitioned. The report of the commissioners was duly approved by the court, and judgment entered vesting title to said land in the parties according to their respective shares, as provided and found in the report of the ·commissioners. Motion for a new trial being overruled, appellants bring this appeal.

The record discloses that Lee Pinkard was the father of appellants, and that they were his children by his first wife, who was dead; that the land was the separate property of Lee Pinkard at the time of his death; that he married Ida Stewart, mother of appellee, August 14, 1919, and that appellee, Gladys Pinkard, was born December 12, 1919, and that Lee Pinkard continued to live with his wife until about February 14, 1920, when they separated and he sued her for and obtained a divorce. The litigants are negroes. The legitimacy of Gladys Pinkard is the only question in the case—was she the daughter of Lee Pinkard? Appellants' three assignments and the propositions thereunder all go to raise the above question, and will be considered together.

[1] The rule is well established that a child born in lawful wedlock is presumed to be legitimate, and antenuptial conception does not weaken the presumption of legitimacy arising from postnuptial birth. Therefore, it appearing that appellee was born after the marriage of Lee Pinkard and her mother and while they were living together as man and wife, the presumption is that Lee Pinkard was her father, and this presumption must prevail until overcome by sufficient credible evidence. 8 Ency. of Evidence (Legitimacy) 163; McCulloch v. McCulloch, 69 Tex. 682, 7 S. W. 593, 5 Am. St. Rep. 96; Patterson v. Gaines, 6 How. 550, 12 L. Ed. 553; State ex rel. Burkhart v. Ferguson, 187 Iowa, 1073, 174 N. W. 934, 8 A. L. R. 428; Dennison v. Page, 29 Pa. 420, 72 Am. Dec. 644; Zachmann v. Zachmann, 201 Ill. 380, 66 N. E. 256, 94 Am. St. Rep. 180; Powell v. State, 84 Ohio St. 165, 95 N. E. 660, 36 L. R. A. (N. S.) 255, note; Westfall v. Westfall, 100 Or. 224, 197 Pac. 276, 13 A. L. R. 1428; 7 C. J. 945, § 15. Appellants do not contest the fact of their father's marriage to appellee's mother, nor that appellee was born some four months after said marriage, but they do insist that appellee is not and

cannot be a child of their father, Lee Pinkard, for the reason, they say, that he was not acquainted with and had not associated with the mother of appellee prior to' the fourth Sunday in April, 1919, and did not see her again until about the last of May, 1919, and was not married to her until August 14, 1919, and that appellee was born December 12, 1919, and was a fully developed nine months' child at birth—in other words, appellee being a fully developed nine months' child at birth, and their father not having known or associated with the mother of appellee prior to the fourth Sunday in April, 1919, it was impossible for their father to have been the father of appellee, on the ground of nonaccess.

Roxana Irwin, daughter of Lee Pinkard, testified that her father and Ida Stewart, appellee's mother, married August 14, 1919, and that appellee was born December 12, 1919; that her father lived with Ida until February 14, 1920, when he carried her away and afterwards got a divorce; that her father never met Ida until the fourth Sunday in April, 1919, she knows, for on that day at a dinner at her house she introduced them, and they said they had never met; that her father did not see Ida any more until the fourth Sunday in May; that they had lived in that county all their lives, but some 16 miles apart; that the child (appellee) was not her father's child, and nobody ever claimed it was; that Ida did not claim it was, but would not say whose it was.

James Pinkard, son of Lee Pinkard, testified that he was living with his father at the time his father married Ida, and that he got acquainted with her the day they married; that the child was born December 12, 1919; that his father and Ida separated February 14, 1920; that after the child was born his father moved into another room, he knew, because he was living with them; that his father did not claim the child, and he never heard any one say it was his father's child.

Zeno Pinkard, son of Lee Pinkard, testified:

"My father was blacker than I am, and I suppose I am as black as I can be. The child's mother is blacker than I am. The child is of a very bright color."

Elbert Brewer, son-in-law of Lee Pinkard, testified that he met Ida Stewart on August 14, 1919; that the baby was born December 12, 1919; that he was living with Lee Pinkard at the time the child was born; that Lee Pinkard stayed at home and did not run around.

This was all the evidence introduced by appellants on the trial of the case, but on the hearing of their motion for a new trial they offered:

(1) Pearl Johnson, who testified that she knew Lee Pinkard and his wife, Ida; that

she helped to wait on Ida when she gave birth to appellee; that the child was full grown and a nine months' baby; that she knew it was not a seven months' baby.

(2) Francis Jackson, who testified that when Ida got sick Lee came after her, and she went and was the midwife when the child was born; that the child was a full grown nine months' baby, and was white. "I'm not going to say if it was a nigger baby or not, but it was mighty white. Of course, it was not Lee Pinkard's. Lee Pinkard couldn't any more have a baby like that than I could, and you know I couldn't."

(3) Jane Bennett, who testified that Lee Pinkard brought Ida to her house to live; that she did not remember the month, but that it was cold; that the child seemed to be about two months old, and was of a very bright color; that Ida told her it was not Lee Pinkard's child.

(4) F. B. Kimball, who testified that he saw Ida in his father's office; that Roxana Irwin (one of the appellants) came to the office and asked him about a case of this kind, and that he got her to bring Ida to the office, and that he asked Ida "point blank" if the child was Lee Pinkard's, and that she said it was not; that after the trial he went to see Ida, and that she then denied that she had told him that Lee Pinkard was not the father of the child.

As exhibits to the motion for a new trial, appellants attached affidavits of:

(1) Bertha Weaver, a daughter of Lee Pinkard, who stated that on the 23d day of December, 1919, she visited her father to spend Christmas with him, and that while there she overheard a conversation between her father and Ida, his wife, in which Ida asked him if he still meant to take her home, and that her father replied, "Yes; as soon as you are able to go, I will take you back and put you down where I got you from;" that Ida then said, "If you wont take me back and will let me stay here, I will give the child away," and that her father replied to her, "No; you have deceived me, the child is not mine, and I am not going to support it;" that Ida then began crying and her father walked out of the room; that she stayed there for 14 days and that her father during that time stayed in a different room; that she lived in Bowie county and was not present at the trial; that she got to court too late to testify, and had had no opportunity to tell her attorneys what she knew until then.

(2) Georgia Irwin, who stated that Ida was her husband's niece and lived with them until she was married August 14, 1919; that Lee Pinkard did not come to her house to see Ida but two times before they were married; that shortly after he married Ida, Lee wrote a letter to her husband that Ida was pregnant and had deceived him, and that he could not afford to live with her, and would not live with her; that later Lee talked with her about it and said that Ida was pregnant when he married her, and that he would not live with her on that account.

In reply to the motion for a new trial, appellee filed answer contesting and denying all the matters set up by appellants, and attached thereto the affidavits of:

(1) March Gray, who stated that he was personally acquainted with Lee Pinkard and Ida Stewart, who was married to Lee; that he lived within one-half mile of Tom Irwin with whom Ida lived, and who was Irwin's niece; that he well remembered the courtship of Ida and Lee; that to the best of his knowledge Lee Pinkard associated with Ida for at least five or six months before they were married; that during that time he had many times seen Lee with Ida coming from and going to Tom Irwin's where Ida lived, and going to and leaving church; that he never saw Ida with any other man but Lee Pinkard during the long time she lived in that community.

(2) Ida Pinkard, who stated that she was the surviving wife of Lee Pinkard, deceased, and the mother of appellee, and that appellee, Gladys Pinkard, is the child of Lee Pinkard; that for five or six months before her marriage to Lee Pinkard, she and Lee Pinkard had sexual intercourse a number of times, which acts continued time after time until their marriage, and after marriage until the birth of appellee; that after the death of her first husband, which occurred about eight years before she married Lee Pinkard, she had never had sexual intercourse with any other man than Lee Pinkard, and that her intercourse with Lee Pinkard began about nine or ten months before the birth of appellee; that she had never made any statement or statements to any person that Gladys Pinkard, appellee, was not the child of Lee Pinkard, or that Lee Pinkard was not the father of appellee; that any and all of the statements made by any person that she had at any time said that Lee Pinkard was not the father of Gladys Pinkard are and were false and untrue; that Lee Pinkard was a stout, robust, and active man in the affairs of life up to the time of his death.

Upon the trial of the case, the court found in favor of the legitimacy of appellee, and, upon the showing made for a new trial, he overruled the motion, thus reaffirming her legitimacy.

[2] We think the judgment should be sustained. Pinkard had been married before, was the father of seven children by his first wife, and was thus broadly experienced in the visible physical appearance and condition of a woman who was pregnant. It is shown he had known, and, according to the sworn statement of Gray, had constantly associated with appellee's mother for a period of at least five or six months before he

married her. If the child was a fully developed nine months' child when born, her mother was five months advanced in pregnancy at the time Pinkard married her, and her condition must have been visibly observable to one as experienced as he was. He continued to live with her and acknowledged her as his wife, knowing that she was pregnant, and, of course, knowing that it was begotten before their marriage, and, she swears, that he continued to have intercourse with her until appellee was born. Such conduct on his part, we think, should be held to be a strong presumption, if not positive proof, that the child was his, and that he so believed.

[3-5] Much of the evidence offered to impeach the legitimacy of appellee was inadmissible, being the conclusions of witnesses, hearsay, and supposed statements of the parents, which were not competent, for the reason that the rule is firmly established that the declarations of neither the husband nor the wife can be received for the purpose of assailing the legitimacy of a child born during wedlock. Jones on Evidence, vol. 1, § 97; 8 Ency. on Evidence, 174; Foote v. State, 65 Tex. Cr. R. 368, 144 S. W. 276, Ann. Cas. 1916A, 1184; Bowles v. Bingham, 2 Munf. (Va.) 442, 5 Am. Dec. 497; Koffman v. Koffman, 193 Mass. 593, 79 N. E. 780; Westfall v. Westfall, 100 Or. 224, 197 Pac. 276, 13 A. L. R. 1428; 7 C. J. 944, § 12. The case was tried before the court without a jury, and the court must have felt that he wanted to hear all that could be given that would throw any light upon the question, and permitted the introduction of much that was inadmissible. The court did not file any findings of fact or conclusions of law, nor does it appear that any were requested; hence it must be presumed that he found the facts such as to sustain his judgment, and it should be further presumed that he did not consider the improper testimony, and made no finding as to same.

[6] We think the judgment is sufficiently supported by the facts. Appellants' testimony came chiefly from themselves. The court had the witnesses before him, heard them testify, observed their manner of testifying, considered their interest in the matter involved, and, after weighing the evidence, found against them. To bastardize a child born in lawful wedlock, the most clear and conclusive evidence of nonaccess is required. There is no proof that appellee is not the child of Lee Pinkard other than the circumstances offered to show nonaccess. Nonaccess may be shown by circumstances, but circumstances which only create doubt and suspicion, and which only tend to show improbability of access are not sufficient. It may be that Roxana Irwin, who testified that her father and appellee's mother never met until the fourth Sunday in April, 1919,

was mistaken as to the exact month, or it may be that the child was but a seven months' child. Appellee's mother swears that she and Lee Pinkard associated together and had frequent acts of intercourse for at least five or six months before they were married, and Gray says that he saw them frequently together for at least five or six months before they married. There is no evidence that she kept company with any other man during that period, or that any one else was suspected of improper intimacy with her.

The presumption of the fact of legitimacy is one of the strongest known to the law, and here being strengthened by the fact of association and the mother's sworn statement that Pinkard, and him only, had been intimate with her before marriage, with the other fact that Pinkard married her when her condition must have been plainly observable, and continued to live with her and to have intercourse with her until the birth of the child, and lived with her for two months after the child was born, we think, fully warranted and justifies the court's judgment, and the same is therefore affirmed.