# CIRCUIT COURT OF BALTIMORE CITY.

Filed September 28, 1928.

DR. JACOB M. MILLER
VS.
LEAH GORDON MILLER.

*Isaac Lobe Straus* for complainant.
*Willis R. Jones* for defendant.

O'DUNNE, J.—

This is a suit for annulment of marriage. Dr. Miller is the complainant, and Leah Gordon Miller the defendant. He is 28 years of age and she 35. They are both Jews. Though complainant, through the medium of counsel, professes the most intense hatred of her, there is no element of *racial* prejudice in the case. Throughout the evidence, there runs a veiled reference to cast, in that he seems to not disguise *his belief* in a better social status than she enjoys. He has entered the noble profession of medicine, whereas she is a girl born in Liverpool with a school education limited to the 6th or 7th grade, supplemented by some further self-education.

The case, viewed from the complainant's side, is a vivid repetition of the story of "Arabella" in Thomas Hardy's "Jude The Obscure."

The grounds on which relief is sought are:

(1) Fraud inducing marriage.

(2) Legal duress inducing marriage by threats of prosecution for bastardy.

(3) Previous unchastity of defendant unknown to complainant.

(4) An artful blending of these three elements, producing a "compound" that went to his head and caused him to marry her June 8, 1927, in Washington, D. C. The basis of his willingness to so do is found in the following facts:

He is a tenant and friend of the Frieds. They had a party at their house on the evening of April 19, 1927, at which the two Fried brothers were present, one an internal revenue officer, and the other a member of the Bar of recent vintage. They supplied home-brew of the Fried making and of the variety known as *"wine,"* possibly of the "Franklin Farms" strength, which was adjudicated not to be "intoxicating in fact." Complainant makes no claim of being intoxicated. On the contrary, he says it made him feel "romantic." Being interrupted at a social function by a patient's call, as medical men frequently are, he took a mote out of a patient's eye, and repaired to his office upstairs. There while seated in the "easy chair" (reserved in literature for editors), the defendant, Leah Gordon, came in. She weighs less than 100 pounds, he about 175. She jumped straddle of his legs, and without even putting her to the inconvenience of removing her "step-ins" he casually had intercourse of her while in that position. A week later, she returned for a renewal engagement, and took the position sanctioned, as between the parties, by this precedent. He claims that he almost, but not quite, re-enacted the "romance" of the previous week, but that the small voice of conscience gained the ascendency, and he restrained himself some where short of fulfillment. (This is his story. She admits her satisfaction on both occasions.)

Complainant says that some days later, she professed alarm at having missed a regularity peculiar to women. He advised "watchful waiting" another lunar month, during which period he prescribed for her to alleviate pain, though nothing to improperly rid her of the occasion for it. She contends, that in addition to the admitted prescriptions, the nature of which is not disclosed in the evidence, he also gave her, *without* prescription, on two occasions, four capsules in a blank covered box with "directions to take" for the purpose of *getting rid of her pregnant condition;* that she took some, six I think, and produced two at the trial. No analysis was made of these capsules by either side. He denies this part of the story. He claims that during the following month of watchful waiting, she complained to him of pains, nausea, dizziness, and fainting spells. She visited his office, professed and exhibited nausea and fainting spells, which he now says he believes were *assumed* and not *real;* that both by word and by act, *she created in his mind the belief that she was pregnant by him as the result of the romance of April* 19th, and that *because* of this, plus the threat of prosecution for bastardy, he went with her on the morning of June 8th, to Washington, to secretly get married, she riding in the coach, and he in the smoker. At Union Terminal, Washington, D. C., they took a taxi. On inquiry of the taxi driver about a marriage license, he drove them to the Court House. They got the license, and on inquiry of the marriage license clerk for a rabbi, he directed them to Rabbi Rubenstein, and called him up on the 'phone to make immediate engagement, which they kept, stopping on the way at Woodward and Lathrop's Department Store where *she* got out, went in and bought a wedding ring. He says, while on the way, she asked him to kiss her after the ceremony to make it appear as if everything was all right, and that he went through the appearance of the kiss, but not the reality. However, admittedly he went through both the *appearance and the reality of the wedding ceremony.* They then came home on the same train, but in different compartments; he left her at Camden Station, Baltimore, and told her that was the end of it, he would not live with her. This was Wednesday, June 8th,

1927. The following Saturday he says she came around and asked him if riding on the street cars could make her regular again, stating that she had been out four times that day on the cars and found she was now all right. He then *accused her* of having tricked him and of having simulated the fact of pregnancy, and claims she said, "Yes, yes, but I love you so," etc., etc. The testimony covering more than a full trial week, and over two days of oral argument, cannot be here abridged, except to assemble the leading legal essential features of both fact and law.

To support the third described ground for relief, viz, previous unchastity unknown to the husband, one Morrinsky is imported from New York to testify as a witness. He says he met complainant one day after his marriage to defendant, and in the course of conversation about such things as they had in common, Baltimore and acquaintances, etc., he mentioned to Morrinsky that he had married Leah Gordon, whereupon Morrinsky said, "You are a damn fool." Complainant asked, "Why?" Morrinsky said, "I have had intercourse with her in 1920, seven years ago." This testimony, therefore, is made the basis of this additional ground on which relief is asked.

The case very naturally presents two aspects: (1) as to the facts, and, on the disputed facts, what facts the trial judge sitting in a jury capacity, passing on the credibility of witnesses, their appearance and demeanor, the inherent probabilities and improbabilities of their stories, etc., under the rules of evidence and burden of proof rule, he feels warranted in accepting. (2) Having found certain facts, as facts, what the *law* is as applied thereto.

So much, therefore, by way of preamble and introduction. I will consider (1) the facts—admitted and disputed. (2) The law, admitted and disputed, and, as applied to this case, most of the law is in the *disputed* classification.

*Admitted Facts.* Complainant admits the marriage June 8th, 1927. Admits the previous intercourse with defendant April 19th before the marriage; denies the fact of her pregnancy; denies her previous chastity, and asserts a previous unchastity with Morrinsky, 7 years before, and claims ignorance

thereof until after his marriage. Asserts duress in the form of her threats of prosecution for bastardy, etc. She denies this, though not much stressed in her testimony, as her counsel relies on the *legal insufficiency* of such evidence, even if admittedly true.

I will deal first with the charge of previous unchastity unknown to the husband. Several considerations here present themselves.

(1) As this is a statutory ground for divorce, and the present case is, in *form*, a bill for the annulment of an alleged void marriage, could the relief in the form of a decree of divorce, be had on a bill for annulment?

The learned counsel for complainant argues with great force that divorce is statutory, and applications for annulment are addressed to the inherent jurisdiction of equity tribunals, that whether considered as a ground for divorce, the ground itself so far overlaps into the domain of general and inherent jurisdiction that, where established by evidence, it would be an *idle form* to eject through one door a suitor who comes clothed in the garb of annulment pleading, and to direct him to re-enter by the side portal, clothed in the habiliments of "Bill for divorce." That difficulty, were it the only one in the way, might be easily disposed of by me on the theory that I think it would sacrifice the *substance* of litigation to a slavish adherence to *form*, and defeat the ends of justice by the application of the same narrow restrictions with which the ancient common law judges long before the time of Lord Coke so far circumscribed themselves, and so far curtailed their jurisdictions, as to give rise, in the first instance, to the *creation* of equitable tribunals. If, therefore, the previous unchastity of the defendant be satisfactorily established, on credible testimony, meeting the burden of proof rule, annulment might well be declared thereon, whether in form of divorce or otherwise, under the *general prayer for relief*. The fact of previous unchastity is asserted by complainant and by the defendant flatly denied. The burden of proof, therefore, rests on complainant.

The evidence in support of it comes from Morrinsky, Mrs. Fried and a housemaid in her employ, both now and then, but who cannot speak English.

Morrinsky, in 1920, was engaged to be married to Leah Gordon, the defendant. The engagement was brief and broken off. This much both admit. The circumstances of the break are disputed. *He* says she was too persistent in pinning him down to a *date* when he would marry her, and that she and her mother began opening his mail when he had a room for a short time in their house, and he got tired of her, and broke away from her. *Her* version of it is that she found out very soon how coarse and uncouth he was, and she could not stand him, and broke the engagement. It is not decisive of the question at bar which version is true. I could accept either, but her description of him runs true to form, as he has exhibited himself in this Court. If she gave him the mitten or the boot, and he felt any animus as a result, it would account for his voluntary appearance here from New York to now testify against her. It would seem more plausible that the excuse or reason he assigns for coming, viz., that he is actuated by "love of justice," and that alone brings him here (plus expense and $10 a day for each of several trips he has made). His story, even more baldly put and more brazenly told than I can picture it, is that he had a room at the Frieds in 1920 (the same Frieds who are the supporting witnesses for complainant throughout); that she (Leah Gordon) came up to his room one Sunday morning in 1920, at the Frieds, when he was still in bed, and got in bed with him and he then and there ruined her, the sheets were bloodstained in consequence, and, at her request, he left the Frieds that day and went to room at her house, and I think he said he did it with her a couple of times there, also again later at Willow Grove, near Philadelphia, where he took her on a holiday trip, when he acted, as driver of the car for Mr. and Mrs. Robinson, by whom he was employed. Accommodation was scant at the shack where they put up at Willow Grove, and he claims that Mrs. Robinson came to him at midnight and told him, in effect, that Leah Gordon was afraid to sleep in the room where she had been put and wanted him, and that he went there and slept with her the rest of the night. Defendant admits they went on the trip and spent the night at Willow Grove; that she had a room to

herself, though some of the furniture had to be improvised or arranged, as the rooms were apparently not ready for occupancy; that he slept in the automobile all night and she in a room to herself. The Robinsons seem to be very reliable and of a superior type, and impress me as being honest in all their testimony. Mrs. Robinson says they all had rooms in the same shack, alongside of each other, or four rooms in a row, as I understand her testimony. She is certainly not of the type woman who would consciously permit a girl on her party in her car to so act. Her husband said it rained hard all night—seeming to negative the argument of Morrinsky sleeping in the car. The wife (Mrs. Robinson) said it did not rain, and her husband was mistaken, and the weather man proved to my entire satisfaction that it did not rain on July 4th, Sunday, at night anywhere in Pennsylvania and probably nothing more than showers even on the 3rd of July, which was Saturday. There is a dispute as to whether the trip was made on Saturday, returning Sunday, July 4th, or whether made on Sunday, July 4th, and returning Monday, July 5th, as definitely testified to by some witnesses, Mrs. Robinson herself not being certain. As the Robinsons were then and are now in business centrally located on Saratoga street, it is hardly likely they would have closed their business all day Saturday for a pleasure trip when July 4th was Sunday, with Monday following as a holiday. They admittedly went one day and came back the next.

To say nothing as to the coarse, uncouth story as told by Morrinsky, and the wholly unsatisfactory explanation of a man now claiming to be happily married in New York willingly coming to a foreign jurisdiction to testify as to having seduced and deflowered a virgin, to whom he was then engaged and having first previously come down here and given his informal affidavit to that effect, later having had his deposition taken and then come on willingly to openly and boastfully testify to it in Court, it also appears, touching his credibility, that in his cross-examination at the time of the deposition, he was asked if he was ever convicted of crime, and he said no; pressed specifically, he was asked if he was not convicted of bigamy and he said not that he knew of. (Both of these in his deposition.) Cross-examined in open Court in this case, he admits he was convicted of bigamy and, furthermore, it now develops that he was sentenced to not more than three years in the New York Penitentiary, and by grace of the parole system, served only seven months in the penitentiary. It also appears that he had a lawful wife at the time he was engaging himself to defendant, Leah Gordon, in 1920, and at the time he claims to have deflowered her as a then virgin. And also at the time he claims to have committed adultery with her several times since, and, as I understand his testimony, he claims to have been gotten a divorce from his present wife, under what he calls the "Enoch Arden law of New York," but apparently he remarried first, and thereby committed bigamy, and he tells us it was done under the advice of counsel in New York. We got a glimpse at some of the practices of some of the New York lawyers in the recent trial of the Whitehurst case in this Court, and I am, therefore, not prepared to disbelieve the possibility in New York of such legal advice.

It is claimed that his story is corroborated as to the original deflowering of defendant, by Mrs. Fried and by her household servant. Mrs. Fried comes tinged with a sense of bias in this case as would cause me to accept her testimony only with the greatest reservation and feeling of uncertainty as to its reliability in any material matter. She says she met Leah Gordon on her second floor near the head of the stairs which led to Morrinsky's room, and made way for her and let her pass downstairs; *that a week or two after that*, her house servant showed her some sheets with blood stains on them. The house servant, who speaks no English, and testified through an interpreter, says she took the sheets the same day Leah Gordon came from the vicinity of Morrinsky's room, and the same day he moved, and showed them to Mrs. Fried or told her of it *the next day*, and claims that Mrs. Fried told her to throw the bedclothes away. It is argued that as this house servant was engaged, among other duties, to do household washing, and in the financial circumstances of the Fried family, it is *incredible* that she would have directed they be thrown away instead of directing the washwoman to wash them and save them. Mrs. Fried places the

incident a week or two after Miss Gordon had been there, wholly at variance with Morrinsky and the house servant.

Nobody other than Morrinsky and defendant know whether the story is true or not. Complainant asserts the truth of it and relies on it as ground for relief from marriage with her seven years later. The best I can do on the evidence, and the worst I can find on this testimony, is the Scotch verdict of *"not proven"* under the burden of proof rule of evidence, because of the wholly unreliable character of the testimony of the witness Morrinsky, self-confessed bigamist and convict, who might well be indicted and extradited for what seems to me to be his manifest perjury in the deposition, depending on whether depositions were taken in this jurisdiction, on one of his three visits here for the purposes of this case, or whether taken in New York, if the testimony was given *there*. The deposition not being offered in this case, because of the willing presence of this witness here, I know not where the testimony was given. It is admittedly false in character, as to a material matter touching credibility, and, under the decisions of our Court of Appeals, as I understand them, would sustain a perjury indictment.

Therefore, I must reject the evidence of previous unchastity as *not proved.* Even if it had been satisfactorily established, I could not subscribe to the belief, under the testimony given by the complainant himself, that it had not been previously communicated to him by Mrs. Fried, to the full extent of her knowledge, with all the inferences she would draw from whatever she knew. He would have us believe that the defendant was a pest to him, and that he could not get rid of her; that he hated and despised her long before his marriage to her. Learned counsel for complainant has almost exhausted the dictionary in emphasizing this thought, and the defendant has sat through as severe an arraignment of a girl or woman as I have ever heard in Court in the living presence of the one described. Tenders of proof have been made, and, for the sake of brevity and logic, and in compliance with the desires of the Court of Appeals to shorten and simplify the records, by expunging all unnecessary detail, only remotely interesting, I have excluded, with exception of complainant, testimony of Mrs. Fried and the other Frieds and complainant's sister, and others, to the *extent* of his alleged aversion for her, and his wish to have her keep away from his office, and of how he loathes and detests her. If this testimony offered be one-half of one per cent. true, is it not also extremely likely that Mrs. Fried would have told Dr. Miller of the non-virtuous character of Miss Gordon, and given him any *corroborative proof* within her knowledge? If it had a foundation in fact, and not in fiction, would it not have been the most potent weapon in his hand to effectually rid him of her, if she were the "pest" to him as characterized by his counsel? Could defendant have hoped under such unfavorable conditions to have had any "romance" with him, whether he was stimulated by sacramental wine or the best of home brew vintage Mrs. Fried could produce, with two such fruitful repositories of the most advanced thought on such matter so readily accessible for consultation, as her two sons who participated in the festivities and partook of her choice liquid refreshments, the one a son of the law, and the other an internal revenue officer in the local and active service of his Government?

My human nature knowledge, gleaned from many and diversified contacts, would induce me to believe that Dr. Miller knew all in this regard that Mrs. Fried ever knew, regarding Leah Gordon.

Let anyone interpret complainant's own version of his knowledge of her chastity vel non when he himself had relations with her.

Dr. Miller was asked if he said anything to her about her chastity up to the time he had intercourse with her, and his answer was that she had said she was a good girl and had never done anything like that in her life with anyone else.

(By Mr. Jones) (Dr. Miller being cross-examined by Mr. Jones about the occasion of his first intercourse with the defendant).

Q. As a physician, weren't you able to tell, as a result of that experience and as a result of the subsequent experience when you say you put your hands on her private parts, whether or not this young lady was or had been,

prior to that time, a chaste girl? A. No, sir.

(The Court) You mean you could not tell?

(The Witness) I did not make such examination as would tell me, and then again 50% of the time——

(The Court) You had intercourse with her?

(The Witness) That was not enough to tell me, your Honor.

Q. (Mr. Jones) You told us on Friday that the time you first had intercourse with Miss Gordon you did not know whether she had previously been unchaste with anyone else or not? A. Yes, sir.

Q. Did you have any occasion then, or when she came back the next time *to ask you to have intercourse with her* over again and you refused, did you have any occasion at either of those times to suspect that she had been unchaste with someone else? A. That *question did not come into my mind* at all.

Therefore, finding (1) that previous unchastity has not been satisfactorily established by the proof under the rules of law, (2) that even were it established the implication of his knowledge of it would be too strong to sensibly resist, I am dismissing this aspect of the case from further consideration, and pass on to new inquiries.

I further find from the evidence as a whole that Leah Gordon Miller did by word and act create in the mind of the complainant the belief that she was then and there (after April 19th, and before June 8th, 1927), pregnant by him.

(a) From which finding I think it would be logical and natural to infer and, therefore, conclude, that in the conversations on that subject matter, and for the purpose of persuading him to marry her, that she also by apt language, thought, and insinuation, and possibly *even by the open and direct threat, made clear to him,* his liability to prosecution for bastardy, "if not now, eventually." She is a woman of decidedly much more personality than he, active and vivacious, he dull and phlegmatic to all appearances, and it is, therefore, not humanly probable that she failed to get the idea very definitely across to him. I am satisfied she did, and that the belief in her then pregnancy, honestly entertained by him, and based on the most justifiable corroborative circumstance, dating back to the "romantic" sensation he experienced April 19th, under the spell of which he responded, plus the liability for resulting bastardy charge, of which liability he was either conscious or of which he was *duly and seasonably reminded* by his companion in romantic adventure, who herself needed no artificial stimulation in the form of wine, *was the inducement to marriage,* as far as he was concerned. If on the evidence I was required to determine whether it was more induced by sense of moral responsibility on his part for the indiscretion of his romance, and the consequences to her and to the possible child, or whether induced by the more selfish fear for his own safety against prosecution, with the effect of the charge on his professional life growing out of a "romance," the scene of which was laid in his office and the "leading lady" being a former patient, and the undesirable notoriety of his escapade in its effect, in his mind at least, on his accomplished sister, another of the Portias lately come to our Bar, I would have little hesitation in concluding it was almost *entirely* and exclusively the combination of the latter circumstances, and with very little of the former in its makeup.

(b) I can not find that the charge of pregnancy was false in fact, still less can I find that it was *fraudulent* in character, irrespective of whether it was at that time a fact or not.

The defendant asserts that she believed she was pregnant; that she had all the symptoms, plus nausea, fainting spells, etc. Her sister, a young woman of refinement and most prepossessing in appearance, offered to tell of her nausea during this period. I excluded this testimony and other testimony of a similar character, for reasons that need not now be averted to, but chiefly to keep the record within the legitimate bounds to which we are admonished by our Court of Appeals.

Much stress was laid in argument on the peculiar language of the defendant's answer, in view of the testimony of defendant given in her examination at one point by the Court. I refer to where she describes the first relations with the complainant as a

"brutal assault on her," and makes no reference to her alleged return for renewal engagement one week later.

Undoubtedly the argument of Mr. Straus is fully warranted by such inartificial pleading. However, we know from our experience and observations that too often the form of the pleading must be laid at the door of the counsel for litigant. Counsel in the early stages of impending or recently instituted litigation are often too prone to share the intensity of the client's feelings and to give vent to eloquence in pleading and to an unnecessary recital of evidential matters, forgetting for the time being that the object of all pleading is to reach an issue of some basic fact asserted on one side and denied on the other, to produce what the law describes as "an issue." This is a patent illustration of science sacrificed to rhetoric.

Defendant's general reputation for truth and veracity has been sought to be impeached. Two witnesses qualified under the rule (which I cannot help regarding as one of the many absurdities of the law). One was a woman whose name I forget, but for whom defendant refused to sign neighborhood consent for the building of a garage. The other was a young barber in the Fried neighborhood. If her bad reputation for veracity was so notorious and discussed by the loiterers around the soda fountain of the neighborhood drug store, why were not legions of them brought in instead of only two? She, on the other hand, supports it by certain witnesses who qualified, and those who know it best, namely her personal acquaintances and employers who knew her from their constant observation of her mingling with the other employees, were unable to qualify under the to me absurd rule of law.

The fact remains in the evidence that she was stenographer for Col. John Philip Hill some years ago, and now employed as secretary for a reverend minister, the name of whose church appears on the stationery of one of the letter exhibits. (I am at the disadvantage of having to make these notes without the testimony in the case having been written up). These facts, humanly speaking, are in themselves a certificate of good character, both for chastity and veracity.

High tone gentlemen in the profession of law as well as in the ministry are generally very careful of the type of women with whom they surround themselves in the handling of their correspondence and office association. While it is not proof against possible imposition, generally careful inquiry is made before engaging such employees. It has at least some evidential value to my mind worthy of note.

PART II—THE LAW OF THE CASE.

I am indebted to counsel on both sides for industrious research of the law, and able presentation thereof.

I have examined and read all of the following authorities on the subject: Fairchild vs. Fairchild, 43 N. J. Eq. 478; Bryant vs. Bryant, 171 N. C. 746 (this case is annotated in L. R. A. 1916 E. 648. with dissenting opinion by Walker, J.); Richards vs. Richards, 19 Pa. Co. Ct. 323; Young vs. Young, 127 S. W. 898; Gardner vs. Gardner, Daily Record, May 2, 1927; Crehore vs. Crehore, 97 Mass. 330; Foss vs. Foss, 12 Allen Mass. 26; Reynolds vs. Reynolds, 85 Mass. 605; Safford vs. Safford, 113 N. E. 181; Seilheimer vs. Seilheimer, 40 N. J. Eq. 412; Carris vs. Carris, 24 N. J. Eq. 516; States vs. States, 37 N. J. Eq. 195; Franke vs. Franke (Calif.), 31 Pacific 571; Gondouin vs. Gondouin (Calif.), 111 Pacific 756; Westfall vs. Westfall (Oregon), 197 Pacific 271; Brown vs. Scott, 140 Md. 258; Corder vs. Corder, 141 Md. 114; Owings vs. Owings, 141 Md. 415; Montgomery vs. U'Nertle, 143 Md. 200; Scott vs. Seabright, 12 Probate Div. 23 (1887); Cox vs. Cox, 110 Atl. 924 (N. J. E.); DiLorenzo vs. DiLorenzo, 174 N. Y. 467; Gatto vs. Gatto, N. H. 106, Atl. 493; Lyman vs. Lyman, 90 Conn. 390, 411; Brant vs. Brant, 41 Legal Intelligencer, p. 54; Wenple vs. Wenple, 170 Minn. 305, 309-310; Robertson vs. Roth, 204 N. W. (Minn.), 329; 39 A. L. R., at p. 1344; Yanoff vs. Yanoff, 237 Mich. 383, 211 N. W., at p. 735, 737; Dibullo vs. Dibullo, 140 Atl. 10 (N. J. E.), Jan., 1928; Jackson vs. Ruby, 115 Atl. 90, 91; Winner vs. Winner, 171 Wis. 439; Warren vs. Warren, 199 N. Y. S. 856; Weil vs. Weil, 172 N. Y. S. 589; Scott vs. Schubert, 5 Paige 43; Wallace vs. Wallace, 137 Iowa 37; Kitayik vs. Kitayik, 202 Mo. App. 74, 213 S. W. 883; Gard vs. Gard, 204 Mich. 255, 11 A. L. R. 923 (annotated 19 A. L. R. 77, ann. p. 80);

Browning vs. Browning, L. R. A. 1916 C. 737.

Gould vs. Gould, 2 L. R. A. (N. S.) 531, a case in which epilepsy was made the cause for annulment. Why not tuberculosis, or a cork leg, or false teeth or false hair, or an artificial complexion or a false figure?

Is it not a fraud? May it not be an inducement to marriage? Caveat emptor has no application in contracts of this character. In fact the moral policy behind the law does not encourage too minute and detailed personal inspection.

There is no limit to the application of the doctrine if we once accept literally the expression Courts sometimes use in discussing certain features of the marriage contract, namely the statement that "marriage is a contract and as such, like all other contracts, is vitiated by fraud." If taken literally, then misrepresentations as to health, wealth, social position, ancestry and personal disposition, would be ground to vacate a marriage if misrepresented. Under the strict application of the last illustration, we might all stand on the brink of an awful precipice. Such is not the law. Judge Offutt, who used both forms of expression in one case above cited, pointed out clearly that it is not applicable to the latter class of illustrations. In applying the rule to the case of the ex-convict and confidence man who married the schoolgirl under the fraudulent claim of being a wounded war hero, Harvard football coach and gentleman of distinction, was not applying the rule of misrepresentation of social status, but was dealing with fraud in its operation on the immature mind of a child. That was the crux of the case. It would have been a reproach to the human justice of the law if any rigid rule of misrepresentation of social status would prevent relief in such case.

Schouler on Domestic Relations, Sec. 1144, says:

"Where, however, marriage is induced by false representations by a woman with whom a man had intercourse, that she is pregnant by him, whereas in fact she is not pregnant at all—he is clearly entitled to *no relief.*"

(He cites L. R. A. 1916 E. 648, annotated and listed above.)

From a careful reading of them I conclude that the English rule is rigid and too extreme for our acceptance, without doing manifest violence to a sense of humane justice.

It would not permit an annulment of marriage upon a fraudulent misrepresentation of pregnancy where the defendant had been intimate with the complainant, even if *she were pregnant by another man* and even if she gave birth to a child not his and of a different color. He would still have to suffer and endure the spectre of a bastard child in his home with its constant reminder of the infidelity of the wife and the palpable fraud thus perpetrated upon him, notwithstanding its grievous consequences to the domestic relations.

Some of the leading American tribunals, especially the earlier decisions in Massachusetts, North Carolina, Pennsylvania, etc., have followed this rule. Other Courts have repudiated this doctrine and I think rightly so. Some have merely repudiated the reasoning assigned by the Courts for the conclusions reached on the facts.

Still other Courts of which Di Lorenzo vs. Same, in 174 N. Y. 467, is the most illustrious example (based, however, on the wording of the New York statute) have, I think, taken too extreme a view on the side of loose liberality. I do not for one minute think our Court of Appeals would commit Maryland to the extreme policy of the law as expressed in the Di Lorenzo case and most certainly not to the extent of the case cited therein as authority, viz. a case where a wife represented before her marriage that she was a widow, when in fact she was only divorced. The Court held this was such a fraud under the policy of New York as to annul the marriage. When Judge Offutt, in Brown vs. Scott, 140 Md. quotes certain passages from the Di Lorenzo case, he makes it clear elsewhere in his opinion in that case, that our Court of Appeals is *not* accepting the doctrine of that case in all its entirety.

Fairchild vs. Fairchild, 43 N. J. Eq. 478, is a case on all fours with this case, *except for* the there admitted falsity of the charge of pregnancy, and is not one in which there was pregnancy by another man (though one Court quotes it as being such a case, which is not warranted by the facts of that case). I subscribe to the *judgment* given in that case, but not to the

*reasoning* set forth in the opinion—or, as our appellate judges some times say, concur in result only.

I think the only way in which sensible harmony can be deduced from the cases, is to marshall them according to their *facts* upon which they are decided, and reject, in a large measure. the reasoning assigned for the conclusion.

The general language used in opinions can only safely be accepted as applied to the particular facts before the Court, and Judge Offutt emphasizes this thought in his opinion in Brown vs. Scott, 140 Md., where he was dealing with the extent and effect of fraud on an *immature mind*.

Reading all the cases and making due allowance for their diversity of fact, and discarding the extreme point of view of the English decisions, as well as the too extreme liberality favoring annulment of *some* of the American Courts, I can fully subscribe to the last paragraph of the learned discussion of the "Law of Annulment" by Franklin G. Fessenden, in his article in 13th Harvard Law Rev., p. 122-3, which is as follows:

"When we compare the English and American rules with reference to fraud it will be seen that both have advantages and disadvantages. The English rule is simple, readily understood, and easily applied. But in some cases it works hardships. The American rule is not so simple, and is difficult of application. But it has the great advantage of affording relief in cases of exceeding hardship. With great care in its application no harm should come to the public interests. The Courts having watch over the public as well as the private welfare, will, it is confidently believed, refuse to extend the rule as to endanger permanence of marriage."

However desirable annulment may be in some cases, as between the parties, the public interest and the public morals must not be subverted to serve the convenience of one party or the other to the litigation.

It seems to me that every case in the attempted application of this more elastic American rule, of annulment, should be governed exclusively by the controlling factors of the particular case, but with an eye ever single to the public consequences of such decision.

If annulment were to be permitted on the facts of this case, as they appeal to me after having seen and heard the witnesses in Court, it would provide a safe refuge against the possible consequences of unrestrained lust. It would undermine male and female virtue. The "romantic" and the "amorous" might then freely indulge, upon the assurance of the male that if the natural consequences of satisfied "romance" should ensue, that he would, in that event. marry the girl. If after having done so, he should find that he was mistaken in his conclusions as to the operation of nature, or, if the use of some simple remedy successfully produces miscarriage, he might well then assert a pretended pregnancy as a *"fraud inducing marriage,"* and, with such a decision as this annulment as an encouraging precedent in that direction, might freely indulge his desires when opportunity presents, and invoke a sort of "sporting theory of justice" or of human nature, to relieve him of an inconvenient marriage, with one whose favor he had freely enjoyed, but for whom he had now lost his taste in view of the great variety from which to make future selections.

Wherefore, it is ordered this 28th day of September, 1928, by the Circuit Court of Baltimore City, that the complainant's bill be and the same is, hereby dismissed, with costs to be paid by the complainant.