*DURANT WOODWARD et al. v. DAVID BLUE et al.

### *Legitimacy—Judge's Charge.*

Where there was evidence that the wife, continuously for three years prior to the birth of the child, lived in open adultery with a white man; that the child, by its color, must have been the child of a white man, and not of the husband, who was a negro; that the mother declared it was not his child, and the husband, though living on the same farm, was not allowed at the house where the wife lived, much of which was contradicted by other evidence: *Held,* that, though there was not impossibility of access, the question of access or non-access became a question of fact for the jury, and the treatment of the child by the paramour was competent as a circumstance tending to corroborate the evidence of non-access.

CIVIL ACTION for recovery of land, tried before *Merrimon, J.,* at Fall Term, 1890, of BURKE Superior Court.

The plaintiffs Mourning Crisp claimed, as widow, and Emily Woodward, as daughter, of one Underzine Pelot. Mourning Crisp testified that her mother was a white woman and her father a slave; that, fifteen or sixteen years before the war, she married Underzine Pelot, a slave of one Greenlea. The rest of the evidence appears sufficiently in the opinion.

The defendants denied the marriage, and also the legitimacy of the plaintiff Emily, now married to Woodward Blue, and claimed the land as the heirs at law of Underzine.

Upon the issue submitted as to the legitimacy of Emily, the jury found in favor of the plaintiff, and from the judgment defendants appealed.

*Mr. S. J. Ervin,* for plaintiff.
*Messrs. J. T. Perkins* and *John Devereux, Jr.,* for defendant.

*Head-note by CLARK, J.

CLARK, J.: The maxim, *"pater est quem nuptiæ demonstrant,"* was formerly so strictly construed that from the time of the Year Books down to the last century a child born of a married woman was conclusively presumed legitimate, unless the husband was shown to be impotent or not *"infra quatior maria."* The ancient rule, with the homely illustration given by Judge RICKHILL in Flettsham and Julian (Year Book 7, Henry IV, 9, 13), is familiar to us by the great dramatist having placed it in the mouth of King John (Act 1, scene 1); *Van Aernam* v. *Van Aernam*, Barb. Ch. Rep., 375. But the rule was much modified in *Pendrell* v. *Pendrell*, Stra. Rep., 925, and the Banbury Peerage case in the House of Lords, 1 Sim. & Stuart, 153, and succeeding cases, until now it is best stated by Chancellor KENT (2 Com., 210), as follows: "The question of the legitimacy or illegitimacy of the child of a married woman is one of fact, resting on decided proof as to the non-access of the husband, and the facts must generally be left to the jury for determination." Schouler Dom. Relations, § 225; *Hargrave* v. *Hargrave*, 9 Beav., 552, opinion by Lord LANGDALE. In *Cope* v. *Cope*, 5 Car. & P., 604, it is said: "If a husband have access, and others at the same time are carrying on a criminal intimacy with his wife, a child born under such circumstances is legitimate in the eye of the law. But if the husband and wife are living separate, and the wife is notoriously living in open adultery, although the husband have an opportunity of access, it would be monstrous to suppose that, under these circumstances, he would avail himself of such opportunity. The legitimacy of a child born under such circumstances could not, therefore, be established."

The evidence of the mother in the present case was that, "while in Tennessee she and Underzine lived in one of the cabins on Greenlea's place; that they were in Tennessee six years, and the plaintiff Emily was born four years after they moved to Tennessee." It may be noted that she does not

testify that Emily was the child of Underzine. As the defendants claim under Underzine, it may be a question under *The Code*, § 590, if the mother, who is a party plaintiff, was a competent witness to show the alleged marriage, or the living together, of herself and Underzine, but the point is not raised by any exception, and we pass it by. .The testimony offered by defendants was that for two or three years, continuously, before Emily was born, the mother lived at the residence of Greenlea, the master, and Underzine and she did not live together for three years prior to Emily's birth, during which time there was no friendly intercourse between them, and Underzine was not allowed at the house where the mother and Greenlea staid; that the child favored Greenlea, and, by its color, was the child of a white man; that the mother told Underzine the child was not his, and he would not have it to support; that Greenlea was an unmarried man, without family. There was evidence on the part of the plaintiffs that Underzine had declared Emily to be his child, and much evidence on the part of defendants that he had repeatedly declared that she was not his child. The defendants then offered to show by a witness, a former slave of Greenlea, who lived on the farm in Tennessee at the time of Emily's birth, how Greenlea treated Emily, with a view of showing that he was her father. The Court excluded the question, and the defendant excepted. Had Greenlea been a defendant in a bastardy proceeding, or in an indictment for fornication and adultery, this evidence would, in view of the other matters in evidence, have been competent. We can see no reason why it should not also have been valuable aid to the jury in arriving at a just conclusion in a proceeding to test the legitimacy of the child. There being evidence tending to show non-access by the husband, the jury should not have been cut off from a knowledge of how Greenlea treated the. child. It may be that it could have been shown that he betrayed fondness and affec-

tion for it, showed anxiety in its illness, lavished money on it, or educated it, and surely these things would be strongly corroborative of the evidence of the defendant, for it would be hardly expected that a white man should so act towards the child of Underzine, his negro slave. Was not the violent grief of David, the King, upon the death of the child, some corroboration that he, and not Uriah, was its father? In the nature of the case the paternity of a child can hardly be said to be subject to direct proof. Therefore, when it is born in wedlock, the law presumes its legitimacy from that circumstance. This presumption can only be rebutted by circumstances, and what more potent could there be than the conduct of the wife in living separate from the husband, with a paramour, and the latter's treatment of the offspring.

For, though there was opportunity of access by the husband, it is not conclusive of legitimacy. *Cope* v. *Cope, supra.*

In *Morris* v. *Davies*, 5 Clark & Finnelly, 163, the House of Lords, on an issue like this, gave weight to the conduct of the paramour towards the child. This, also, was done in *Cannon* v. *Cannon*, 7 Humph., Tenn., 410; 1 Bish. Mar. and Divorce, § 448. Such testimony is in the nature of natural evidence, and stronger than a mere declaration of paternity by the paramour.

It should appear what the party offering excluded testimony expected to prove by it (*State* v. *Williford*, 91 N. C., 529), but here the question is sufficiently explicit, in that it was asked to show the treatment of Emily by Greenlea, and the bearing of the evidence is sufficiently indicated by the question and the statement that it was offered as testimony to show that Greenlea was the father.

When this case was here before (103 N. C., 109), the Court, SMITH, C. J., delivering the opinion, pointed out that the so-called marriage of Underzine and the mother, the former being a slave, and the latter a free person (the child of a white mother and a slave father) was utterly invalid till the

act of 1879 ( T.he Code, § 1281, canon 13), and that "to repel the inference of paternity, drawn from the mere fact of cohabitation (by that act), the same stringent rules do not prevail as in cases of established legal marriage," for the application of that statute is made to depend upon "cohabitation subsisting at the birth of the child, and the paternity of the party from whom the property claimed is derived. The cohabiting alone does not confer legitimacy, though it furnishes presumptive evidence," which is open to disproof.

A fortiori there was error in rejecting the testimony offered.

*Per Curiam.*                                Error.