Argued September 8; affirmed October 5, 1943

In re Rowe's Estate

ROWE *v.* ROWE

(141 P. (2d) 832)

Before BAILEY, Chief Justice, and BELT, KELLY, LUSK, BRAND and HAY, Associate Justices.

*Charles H. Heltzel,* of Salem, for appellant.

*Ira W. Carl,* of Portland, for respondent.

HAY, J. Edwin F. Rowe, a resident and inhabitant of Marion county, Oregon, died on October 21, 1940, leaving an estate in said county. On the petition of Alzina Rowe, the decedent's widow, and of John A. Heltzel, the county court of Marion county duly appointed John A. Heltzel administrator of the decedent's estate. The petition alleged that decedent left as his only heirs Alzina Rowe, his widow, and Alonzo Rowe, his son, and the order appointing the administrator adopted such allegation as to heirship. In due course, the administrator filed a final account, in which no statement was made respecting heirship. Thereafter he filed an amended final account, wherein he alleged that, since filing the original final account, he had made an investigation and had ascertained therefrom that Alonzo W. Rowe, who is named as Alonzo Rowe in the petition and in the order appointing the administrator, was only a stepson of decedent, and hence was not entitled to any distributive portion of the estate. Alonzo W. Rowe duly objected to such amended final account. The widow answered, and issue was joined upon the question of the paternity of the objector. A hearing upon such question was had in the circuit court for Marion county, to which, in the interim, the legislature had transferred jurisdiction of probate matters, and in due course such court made its decree sustaining the objections and adjudging that Alonzo W. Rowe was the legitimate son and an heir at law of Edwin F. Rowe, entitled to his distributive share of decedent's estate. The decree further pro-

vided that "the entire costs of this proceeding, including compensation of the administrator be paid from the assets of this estate before distribution". From this decree the widow, Alzina Rowe, has appealed to this court. Alonzo W. Rowe has appealed from that portion of the decree which provides that the costs of the proceeding, including compensation of the administrator, be paid from the assets of the estate before distribution. We shall refer to the widow as the appellant and to Alonzo W. Rowe as the respondent.

At the outset we are met with a contention on the part of the respondent that the appellant is estopped by the allegation, in her petition for the appointment of an administrator, that the respondent is a son and heir of the decedent. He also contends that the order appointing the administrator is res judicata on the question of heirship.

The finding of a county court, sitting in probate, upon the jurisdictional facts alleged in a petition for the appointment of an administrator, is a final judicial determination. *Holmes v. Oregon & C. R. Co.,* 7 Sawy. 380, 9 F. 229, 232. The single jurisdictional fact, so far as the present case is concerned, was that the decedent, at or immediately before his death, was an inhabitant of the county. Sections 19-206 and 19-210, O. C. L. A. In addition to such jurisdictional fact, the law requires that the petition shall state whether or not the deceased left a will, and the names, age and residence, so far as known, of his heirs. Section 19-203, O. C. L. A. It would appear that the allegations respecting heirship are not jurisdictional, and that the court's order thereon is not *res judicata.* Section 2-721, O. C. L. A. This is the rule generally followed by the courts. *Morgan v. Dodge,* 44 N. H. 255, 82 Am. Dec. 213;

Bancroft's Probate Practice, vol. 1, section 276; 21 Am. Jur., Executors and Administrators, section 122; Anno., 119 A.L.R., p. 608. *A fortiori*, appellant is not estopped by the allegations of her petition respecting heirship, the statute requiring only that the heirs be named *so far as known*.

The evidence shows that in the year 1866, the respondent's mother married one Benjamin Pugh. They lived together for a number of years, and had several children. Some three years prior to 1891, they separated, and the respondent's mother began living with the decedent, Edwin F. Rowe. Mrs. Pugh and Rowe cohabited, ostensibly as man and wife, from that time until the woman's death. During this period, on April 3, 1891, Mrs. Pugh gave birth to the respondent herein, who was named "Alonzo" after an uncle of Edwin F. Rowe's. The respondent was brought up in the family of Edwin F. Rowe as his son. On December 18, 1898, at Helena, Montana, Mary E. Pugh filed suit against her husband, Benjamin Pugh, alleging desertion, and seeking to divorce him on that ground. Personal service in Montana was made upon the defendant, who defaulted, and, upon such default, a decree of divorce was duly entered on May 17, 1899. Five days thereafter, Mary E. Pugh, under the assumed name of Ireland, married Edwin F. Rowe. Mary E. Rowe (formerly Pugh) died on March 21, 1905. In 1913, Edwin F. Rowe and the appellant herein, Alzina Rowe, intermarried.

■ Even in the absence of statute, it is the general policy of the law to presume that all children are legitimate. 7 Am. Jur., Bastards, section 1; *In re Gregoire's Estate,* 156 Or. 111, 64 P. (2d) 1328; *Stegall v. Stegall,* 2 Brock. 256, 22 Fed. Cas., p. 1226.

■■ The appellant takes the position that respondent, having been born in wedlock, must be presumed to have been the legitimate child of Mary and Benjamin Pugh. There is, by statute, a disputable presumption in favor of the legitimacy of children born in wedlock. This is the law of Montana, where the respondent was born, (Rev. Codes of Mont., 1935, sections 5830 and 10606), and it is also the law of Oregon. (Section 2-407, subd. [32], O. C. L. A.) The disputable presumption thus established is regarded as conclusive, unless rebutted by evidence showing the husband's impotency or his non-access. 7 Am. Jur., Bastards, section 43. The presumption is a very strong one, and may not be overcome by less than "clear, satisfactory and convincing" evidence. *In re Gregoire's Estate,* supra; *Westfall v. Westfall,* 100 Or. 224, 197 P. 271, 13 A. L. R. 1428. One court, indeed, has indicated that it may be overcome only by evidence which establishes the fact to the contrary beyond all reasonable doubt, *(Stegall v. Stegall,* supra), but this court has not gone so far.

> "When all the ends which the presumption of legitimacy is designed to conserve have been defeated by sordid facts, the courts must deal with the situation in a common-sense way. * * *" *Nolting v. Holt,* 113 Kan. 495, 215 P. 281, 31 A. L. R 1117.

■ In view of the presumption, no doubt the burden was upon the respondent to establish his contention that he was not the legitimate son of Benjamin and Mary Pugh.

There is a conclusive presumption by the law of Montana that the issue of a wife cohabiting with her husband, who is not impotent, is legitimate. Rev. Codes of Mont., 1935, section 10605, subd. 5. The matter of impotency, however, has not been raised in this case.

■ Access of the husband usually is presumed unless the contrary is shown. 10 L. R. A., 662, note. Proof of non-cohabitation by husband and wife must be clear and positive. Anno., 7 A. L. R., p. 329.

Rowe and the former Mrs. Pugh cohabited, ostensibly as man and wife, for some years immediately prior to Alonzo's birth. This was conclusively established, and was moreover practically conceded. Up to the time of the death of Alonzo's mother, she, Rowe and Alonzo lived together as one family. Rowe, on numerous occasions, recognized Alonzo as his son. This he did sometimes in a negative and ungenerous manner, (as, for example, when he told the appellant that Alonzo "might have been my boy and he might not"), and sometimes without reservation. To Mrs. Minnie Sheppard, a neighbor, Rowe spoke of Alonzo either as his son, or as "that boy of mine". Gunder Rustad, another neighbor, testified that, in 1938, Rowe told him that he had a son, that the son "had done something wrong to him", and that he would never forgive him. Mrs. Sara Peterson, Rowe's niece, testified that she first saw Alonzo at Boyceville, Wisconsin, when he was just a small boy and she was a girl in her teens. The child was with Rowe at that time and he spoke of him as his son, never as his stepson. I. L. Blodgett, Rowe's nephew, testified that he had heard Rowe refer to Alonzo as his son, and that it had always been common reputation in the family that Alonzo was Rowe's son. The appellant herself testified that she had always understood that Alonzo was Edwin F. Rowe's illegitimate son. Alonzo testified that, when he was a boy of around fourteen or fifteen years of age, he worked as a sort of houseman at a hotel in Helena, Montana, and that, although he was not living at home, Edwin F.

Rowe collected his first wages, and disgorged the money only after considerable argument. After his mother died, Alonzo and Rowe "batched" together for about a year, until Rowe remarried. Rowe, on one occasion, gave Alonzo's wife some property. Mrs. Ada Kennedy, a San Francisco policewoman, who is a cousin of Rowe's, testified that she first saw Alonzo in Mason City, Iowa, when he was a creeping infant less than a year old. Rowe had brought him there to the home of Mrs. Kennedy's mother and desired that she should raise him. Rowe said that the child was his, and that his wife had died. He stayed there a month or six weeks, and thereafter took the baby back to Montana. He had been living with Mrs. Pugh, and his brother tried to get him to leave her, but he refused to do so. Mrs. Kennedy testified further that the family reputation was that Alonzo was Rowe's son. It is true that Mrs. Mae Wright, appellant's sister, testified that Edwin F. Rowe disowned Alonzo "right from the first time I ever seen him, he said he was no part of his family". The evidence indicates that for a time there was bad feeling between Rowe and Alonzo, and we are uncertain as to whether Mrs. Wright meant to say that Rowe intimated that Alonzo actually was not his son, or was merely venting his spleen upon a son whom he had grown to dislike. Mrs. Gunda Rustad, a practical nurse who was employed in the Rowe household, testified that the appellant told her, after Edwin F. Rowe's death, that Alonzo was "mean to Ed", (meaning Edwin F. Rowe), and, on the witness asking her whom she meant, said she was talking "about Ed's son". (Rowe had no other son.) The appellant told the witness further that Alonzo "was going to get his share, but if he would come to the house she wouldn't be at home".

Alonzo has always used the surname of Rowe and never that of Pugh. One school record, dated 1898, gives his name as Alonzo Rowe and his mother's as Mrs. Mary Pugh, and another, apparently made about 1903, gives his name as Alonzo W. Rowe and his father's as Mr. E. Rowe.

All of these circumstances were material evidence on the question of the status of the child as Rowe's son. 7 Am. Jur., Bastards, section 39. In *Goodright v. Saul,* 4 Term Rep. (Durnford & East) 356, (1791), it was held that the circumstance of a person's having taken the name of the man with whom his mother was living at the time of his birth, which was retained by him always thereafter, went strongly to rebut the presumption of access by his mother's husband, and was a very strong family recognition of his illegitimacy. There are letters in evidence before us in which Rowe addressed Alonzo as his son. Rowe being dead, evidence of such declarations by him was competent as proof of the fact of such relationship. *In re Wray's Estate,* 93 Mont. 525, 19 P. (2d) 1051, 1055; 7 Am. Jur., Bastards, section 27. This court, in *State v. McDonald,* 55 Or. 419, 441, 104 P. 967, intimated that the declarations of a putative father in letters to a supposed son, addressing him as his son, are admissible in evidence upon the question of paternity, and will be construed prima facie to mean that the person so addressed was his legitimate son. Common reputation, existing previous to the controversy, is competent evidence on an issue of pedigree. Section 2-228, subd. (11), O. C. L. A.; *State v. McDonald,* supra. On the question of legitimation of bastards, it has been held that somewhat less is required by way of recognition in cases where the parents have in-

termarried, as they did here subsequent to Alonzo's birth, than where they have not done so. Anno., L. R. A., 1916E, 662.

■■ There was evidence offered at the hearing, tending to show a strong physical resemblance between Alonzo and Edwin F. Rowe. The appellant testified that others had told her of this resemblance, but said that she herself could not see it. Evidence of such resemblance is admissible in cases of paternity, although it is received with caution. Anno., 40 A. L. R., p. 97. It must be conceded that such evidence is insufficient in itself to establish paternity, and is helpful only in deciding doubtful cases. 7 Am. Jur., Bastards, section 49. This court, however, has given its approval to the exhibition of a child—even a very young infant—to a jury upon a disputed question of paternity, and has recognized the physiological fact that peculiarities of form, features and personal traits are often transmitted from parent to child. *State v. Russell,* 64 Or. 247, 250, 129 P. 1051; *State ex rel. Dickerson v. Tokstad,* 139 Or. 63, 8 P. (2d) 86; *State ex rel. v. Bartlett,* 141 Or. 560, 18 P. (2d) 590; *Anderson v. Aupperle,* 51 Or. 556, 95 P. 330.

■■ The respondent's mother divorced her husband, Pugh, upon a complaint charging him with desertion and abandonment commencing in September, 1887, and continuing thereafter. The respondent contends that the decree which established the fact of such desertion is *res judicata* upon that point as against all the world. On the basis of such contention, he argues that the non-access of his mother's husband to his mother during the period of such desertion is conclusively established. We do not concede, however, that, as against the appellant herein, the decree is *res judicata* of the

fact of desertion, to say nothing of the inference of non-access sought to be drawn.

> "While the decree in a divorce suit as a decree in rem binds the whole world as to the status of the parties, to the extent that their status is the res adjudicated, with that limitation it is subject to the usual rule that estoppels must be mutual and is therefore not conclusive for or against any third person in reference to the facts which it necessarily affirms or denies. Judgments in rem, as such, are not res judicata with respect to facts incidentally though necessarily determined, except as to the res adjudicata. As between strangers or between parties and strangers, a decree of divorce does not establish the previous validity of the marriage, since the res involved and adjudicated is the condition of subsequent singleness of the parties and not the valid prior existence of marital relations between them. * * *"

Freeman on Judgments, vol. 2, section 910, and cases cited.

■ The divorce complaint failed to make mention of any of the children who were born to the Pugh marriage, although there were several. If the names of those children who were concededly the legitimate offspring of Pugh and his wife had been included, and that of Alonzo alone had been omitted, that might be persuasive as a declaration by Alonzo's mother that Alonzo was not the son of Benjamin Pugh. However, it is generally held that neither the husband nor the wife may be permitted to testify as to non-access between them in cases where the legitimacy of a child born in wedlock is called into question. 7 Am. Jur., Bastards, section 21; *Goodright ex dem. Stevens v. Moss,* 86 Eng. Reprint, 1257; *Martin v. Stillie,* 129 Kan.

19, 281 P. 925; 68 A. L. R. 415, 417; *Westfall v. Westfall,* supra.

 The facts that the husband and wife were living apart and that the wife was notoriously living in open adultery have been held to be sufficient proof of non-access on the part of the husband, even although he might have had the opportunity of access. It is our opinion that the evidence in the present case is "clear, satisfactory and convincing" that, at the time of the conception and at the time of the birth of the respondent herein, his mother and her husband were living apart, and that, for a period of years before, at and after the date of such birth, the mother had been living in adultery with Edwin F. Rowe. In a leading English case, *(Cope v. Cope,* 5 C. & P. 604, 1833), the court expressed the opinion that it would be monstrous to suppose that, under such circumstances, the husband would avail himself of the opportunity of access to his wife, even if such opportunity were present. A similar opinion was expressed by the court in *The Aylesford Peerage Case,* (L. R.) 11 App. Cas. 1, 17, 18, (1885). In *Woodward v. Blue,* 107 N. C. 407, 12 S. E. 453, 10 L. R. A. 662, 22 Am. St. Rep. 897, it was said that the presumption of legitimacy of a child born in wedlock might be rebutted by circumstances showing the contrary, and that there could be no such circumstance more potent than the conduct of a wife living separate from her husband with a paramour, and the latter's treatment of the offspring. See also *Stegall v. Stegall,* supra; *Ray v. Ray,* 219 N. C. 217, 13 S. E. (2d) 224, 226; *In re Findlay,* 253 N. Y. 1, 9, 170 N. E. 471. We subscribe to the doctrine of those cases, and of many others which we have not cited. It is our opinion that the lower court correctly found, from the evidence

in this case, that the respondent, Alonzo W. Rowe, was the illegitimate son of Mary E. Pugh and the decedent, Edwin F. Rowe.

■ The intermarriage of Mary E. Pugh with Edwin F. Rowe subsequent to the birth of their illegitimate son, Alonzo W. Rowe, had the effect of making the respondent their legitimate son, both by the law of Montana and by the law of Oregon. Rev. Codes of Mont., 1935, section 5852; section 16-202, O. C. L. A.

■■ As for the respondent's cross-appeal, it is apparent that counsel for the respondent believed that the lower court intended to allow to the administrator, who is an attorney at law, additional compensation for legal services performed in connection with the hearing. The reply brief of the appellant, however, makes it clear that the administrator sought no such compensation. Appellant construes the meaning and effect of the lower court's decree in that regard as requiring, first, payment to the administrator of his ordinary compensation for administering the estate, and second, payment from the assets of the estate of the ordinary costs and disbursements of the proceeding on the objections, such as filing fees, trial fee, reporter's fee, witnesses' fees, etc., as incurred by both respondent and appellant. Such, we believe, is a correct construction of the trial court's decree, and we are of the opinion that the court acted within its discretionary powers in this respect.

The decree of the circuit court is affirmed, without costs to either party.

BELT, J., did not participate in this opinion.