Argued November 19, 1952, affirmed February 26, 1953

# PARSONS *v.* PARSONS

253 P. 2d 914

*Herbert A. Perry,* of Beaverton, argued the cause and filed a brief for appellant. With him on the brief was E. J. McAlear, of Hillsboro.

*Francis E. Sturgis,* of Hillsboro, argued the cause for respondent. On the brief were Hare, Sturgis & Burdett, of Hillsboro.

Before BRAND*, Chief Justice, and ROSSMAN, LUSK, LATOURETTE**, WARNER and TOOZE, Justices.

BRAND, J.

James M. Parsons, as plaintiff, brought suit for divorce against his wife, Joyce Carole Parsons, who filed a cross complaint. After trial the court awarded a divorce to the defendant, giving her the custody of the "minor daughter of plaintiff and defendant" and directed the plaintiff to pay to the clerk of the circuit court $40 per month for the care of said child. Plaintiff appeals.

The abstract is needlessly encumbered by the inclusion therein of the original complaint filed on 23 February 1950, the answer thereto, an amended complaint filed on 20 October 1950, and a motion directed against it. A second amended complaint was filed on 20 November 1950 which set forth additional facts alleged to have occurred after the institution of the suit, and which, therefore, should have been presented by supplemental complaint. The second amended complaint alleged that there was "born to the defendant, a baby girl * * * on the 18th day of October, 1950, and

---

* Chief Justice when this case was argued.
** Chief Justice when this opinion was rendered.

that this plaintiff has denied herein and does now deny that he is the father of said child * * *.'' Two days after the birth of said child, the plaintiff moved the court for an order requiring that both the plaintiff and defendant and the baby ''submit themselves to such blood grouping and blood typing tests as may be necessary'' for such bearing as the tests might have upon the question of the legitimacy of the infant. On 11 December the court, Judge Peters presiding, denied the motion. On 13 December the defendant filed an answer and cross complaint. Plaintiff then moved for a change of judge. A reply was filed and on 23 April 1951 the case went to trial before Judge Zimmerman, resulting in the decree for the defendant.

In his brief the plaintiff makes two assignments of error. First, the refusal of the court to grant the motion for a blood test, and second, the failure to grant a decree of divorce to the plaintiff. The argument upon the second assignment of error was directed solely to the evidence offered on the issue of adultery. Plaintiff omits therefrom any discussion of the general allegations of his complaint concerning cruel and inhuman treatment. In argument before this court counsel stated that ''the real contest'' was on the denial of paternity.

■ We will first consider the issues raised by the second assignment of error. The plaintiff claims that the evidence raised a reasonable inference of adultery, if it did not in fact prove adultery.

The parties were married in August 1949. The plaintiff testified that on 17 February 1950 one Lloyd Sears came to the plaintiff's apartment. The plaintiff met him at the door. We quote:

   ''A * * * I asked him who he was looking for; he says he was looking for Iris or somebody

else. I said, I thought you were looking for Joyce when you called up on my buzzer and he said he thought Joyce knew where she lived or Joyce knew where he could get in touch with her; I believe at the time he was looking for Iris, his ex-wife. I told him then I didn't want him hanging around this apartment; he had no business there; his wife wasn't there and I didn't want him messing around with my wife. I told him to be on his way if he wanted to keep himself out of trouble. I never saw anything of the fellow until the following Monday night * * *."

On 20 February the plaintiff, who was a deputy sheriff, while patrolling the Pacific Highway 99, a main-traveled arterial highway, saw a car parked on the side of the road. He testified:

"A * * * I put the light in there and seen two people in the car; one appeared to be a boy and one a girl; I should say a man. The man was on the right hand side of the car; the woman was in the middle of the car next to the man. As I put my light in there, the woman turned her head. I walked over to see who it was and I found my wife with Lloyd Sears * * *

* * * * *

"A. I opened the door and—on the left side and helped her out. As I opened the door, her purse fell out; it was in back of the car, the seat of the car. I took her by the arm and assisted her over and put her in the back seat of my car. I went back to Sears; I don't remember what I said to him. I saw lipstick on his face, but anyway I told him to be on his way. * * *."

Concerning this incident, the plaintiff testified, "I don't know what was going on in there." The defendant offered some false explanations concerning her presence in the car. This is the only occasion on which

the defendant was seen with Sears, her alleged paramour, so far as is disclosed by the evidence. Plaintiff testified:

"Q I believe you have testified when you are employed as a deputy sheriff, you would return home and find she wasn't there, didn't you?

"A I have on an occasion or two, yes sir."

Sears was killed in an airplane crash during the summer of 1950. Plaintiff seeks to support his claim of adultery by evidence that the defendant and her parents, in company with "a lot of people", were present at the scene of the crash, and that the defendant "was kind of red eyed."

The plaintiff left the home of the parties on 21 February, the day following the incident on Highway 99. On direct examination the plaintiff was asked, "has there been any child or children born to this marriage, you being the father?" No objection was made to the question, and the plaintiff answered, "I don't know."

By way of summary, it appears that the plaintiff and defendant were living together until 20 February 1950, and that a child was born to the defendant eight months after their separation. The defendant and Sears were seen together upon only one occasion. They were in the front seat of a car on the side of a public thoroughfare at 10 p. m. Sears had lipstick on his face. It is not the function of this court to approve or condemn the mores of the present generation, but unless we close our eyes to the facts of life, we must admit that many an innocent man has sat in a car, or in some other place, with a friend, at 10 p. m., and has left that place with the telltale mark of lipstick on his face, a mark for which he, or she, or both, may have been responsible. But to argue that such conduct raises a

reasonable inference of adultery is preposterous. As said in *Jenkins v. Jenkins*, 103 Or 208, 204 P 165, 221:

"* * * Indiscretion is not adultery. Suspicion is not proof. That an act of adultery might possibly, or even probably, have been committed, is not proof that adultery was committed. * * *"

The plaintiff cites the following from the same case, as supporting his position:

"From a valuable work on trial evidence we quote with approval:

"'The evidence to authorize a divorce on the ground of adultery need not be direct, but if circumstantial the circumstances must be such as would lead the guarded discretion of a just mind to the conclusion of the truth of the facts. The circumstances are to be taken together and when combined must tend to establish the following three facts: 1. The lustful disposition of the party charged towards the alleged paramour; 2. A like disposition on the part of the latter; 3. The opportunity to commit the act. These three facts must be reasonably approximate in point of time. The proof must sustain an inference of actual connection * * *.' 3 Abbott's Trial Evidence (3 ed.), pp. 2033, 2034."

However, the same court also quoted with approval the following statement:

"'Where the facts relied on to establish adultery may import innocence as well as guilt, they must be held to import innocence.' 19 C.J. 125.

"The same rule is here stated:

"'Circumstances susceptible of a reasonable interpretation consistent with innocence and which do not lead to guilt by a fair inference as a necessary conclusion are insufficient.' 3 Abbot's Trial Evidence (3 ed.), p. 2034."

The plaintiff cites *Herberger v. Herberger*, 16 Or

327; *State v. Eggleston,* 45 Or 346, 77 P 738; and *State v. La More,* 53 Or 261, 99 P 417. In the Herberger case the court said:

"* * * Of course, direct proof is rarely attainable, and is not necessary; but where circumstances are relied upon they ought to be such as to lead to the conclusion of the adulterous intercourse, not only by fair inference, but as a necessary conclusion. Appearances equally capable of two interpretations, one an innocent one, will not justify the presumption of guilt. * * *"

In the Eggleston case the court held that evidence of an adulterous disposition was admissible. But, in that case, the disposition was shown by evidence of other acts of adultery. The court quoted with approval from *State v. Bridgman,* 49 Vt 202, 24 AR 124, as follows:

"' '* * * The offense charged in this case cannot ordinarily be committed till the restraints of natural modesty and the safeguards of common deportment and conventionality have been overcome by gradual approaches, and the relations of the parties have been changed from those usually existing between the sexes to the most intimate. * * * Thus it appears that the true relation of the parties to each other in this respect is very material and proper to be shown. * * *.' "

While the language employed by the Vermont court somewhat exceeds the normal scope of judicial knowledge, there is merit in its pronouncement. In the case at bar, evidence concerning a single occasion is offered to establish both adulterous disposition and opportunity. We find "opportunity" defined as a fit or convenient time. Webster's New International Dictionary, Second Edition. This court cannot say that the circumstances under which defendant was found consti-

tuted either a fit or convenient time. As said in *State v. Eggleston,* supra, at 357:

"* * * If adultery could be inferred from the existence of an opportunity to commit the act, it would be unsafe for persons of opposite sex to meet, except in the presence of others. * * *"

We hold that the evidence went no further than to prove indiscretion and to create suspicion of adultery.

■ We will next consider the contention that the court erred in denying plaintiff's motion for a blood test. Upon this issue counsel has presented valuable scientific evidence concerning the value of blood tests when offered to disprove paternity, and also concerning the law relative thereto. Plaintiff recognizes the difficulties presented by the provisions of OCLA, § 2-406(6), which provide that there is a conclusive presumption that the issue of a wife who is cohabiting with her husband, who is not impotent, is legitimate. Other difficulties are presented by our decisions in *Westfall v. Westfall,* 100 Or 224, 197 P 271, and *In re Rowe's Estate,* 172 Or 293, 141 P2d 832, which hold that neither husband nor wife is competent to testify to nonaccess. He contends, however, that OCLA, § 2-406 (6) should be construed to permit the introduction of blood tests to disprove paternity. It is suggested that we should hold that "impotent", as used in our statute, should not be limited in meaning to inability to procreate, but should be construed broadly as descriptive of any condition where it is impossible by the laws of nature for the husband to have been the father of the child in question. Plaintiff cites *State v. Damm,* 62 SD 123, 252 NW 7, 266 NW 667; *Estate of Mills,* 137 Cal 298, 70 P 91; *Estate of Walker,* 180 Cal 478, 181 P 792; *Gonzales v. Pacific Greyhound Lines,* (Cal 1949), 202 P2d 135; (See also *Gonzales v. Pacific Greyhound Lines,* 34

Cal2d 749, 214 P2d 809.) ; *Dazey v. Dazey,* 50 Cal App2d 15, 122 P2d 308; *Williams v. Moon,* 98 Cal App2d 214, 219 P2d 902; *Berry v. Chaplin,* 74 Cal App2d 652, 169 P2d 442. See also *Hobson v. Hobson,* 59 NSW WN 85 (1942) ; *In re Lentz,* 247 AD 31, 283 NYS 749; *Dellaria v. Dellaria,* 183 NYM 832, 52 NYS2d 607; *Nolting v. Holt,* 113 Kan 495, 215 P 281; *Jordan v. Davis,* 143 Me 185, 57 A2d 209.

Again, it is argued that if OCLA, § 2-406 (6) must be construed as prohibiting the introduction in evidence of blood tests to prove non-paternity, then the statute is unconstitutional under the due process clause of the Federal Constitution and under section 10, article I of the Oregon constitution.

Plaintiff relies by analogy upon *Manley v. State of Georgia,* 279 US 1, 73 L ed 575; *Western & Atlantic R.R. v. Henderson,* 279 US 639, 73 L ed 885; *Heiner v. Donnan,* 285 US 312, 76 L ed 772. Cited by respondent as contra are: *Carter v. LaDee Logging Co.,* 142 Or 439, 459, 18 P2d 234, 20 P2d 1086; *Ex parte Sizemore,* 110 Tex Cr R 232, 59 ALR 430; *People's Wayne County Bank v. Wolverine Box Co.,* 250 Mich 273, 230 NW 170; *State v. Old Tavern Farm,* 133 Me 468, 180 A 473; *West Coast Hotel Co. v. Parrish,* 300 US 379, 81 L ed 703, 108 ALR 1330. *Carnine v. Tibbetts,* 158 Or 21, 74 P2d 974, cited by plaintiff, is clearly distinguishable. Neither party has discussed the bearing of *Rochin v. California,* 342 US 165, 96 L ed 183, upon the issues of this case.

We have made reference to the authorities presented because of the possible interest which the profession may have in the above-mentioned issues, but the decision of those issues is not determinative in the case at bar. Counsel for the plaintiff frankly concedes that ''it is within the trial court's sound discretion

whether or not to grant a motion for a blood-grouping test'', but he argues that the refusal of the court in the instant case constituted an abuse of discretion because the ends of justice require that the tests be made. We decline the invitation to pass upon the construction of OCLA, § 2-406 (6) and find no necessity in this case for consideration of the constitutional issue which might arise if the statute should be construed as prohibiting blood tests in cases of this kind.

Plaintiff and defendant were living together as husband and wife nine months prior to the birth of the child. They separated eight months before the birth of the child and immediately after the incident at the roadside. Assuming, but not deciding, that the court had the power under the statute, and the right under the constitution, to compel a mother and infant to submit to blood tests, we hold that it was within the sound discretion of the court in this case to deny the application. Judicial discretion is not lightly to be overthrown. There was no abuse of that discretion when the court refused to make the order demanded by the husband for the purpose of bastardizing a child born to his wife in lawful wedlock and when the claim of illegitimacy is based upon mere suspicion of adultery.

We have read all of the evidence concerning the reciprocal charges of cruel and inhuman treatment. Upon that issue we are constrained to affirm the decree for the defendant. The trial court saw the witnesses and its findings should not be disturbed, although the case, aside from the charges of adultery, is not a strong one. The plaintiff testified that the parties could no longer live together. There is proof that the plaintiff, at least once, administered corporal punishment to his wife, and there is ample proof of his unsupported accusations of adultery.

The decree of the circuit court is affirmed.