Argued February 5, remanded with directions March 9,
petition for rehearing denied April 5, 1960

## ETTIN *v.* ROBINSON ET UX

349 P. 2d 1097

*Robert S. Ringo* and *James W. Walton,* Corvallis,
argued the cause and submitted briefs for appellants.

194

*Melvin Goode,* Albany, argued the cause and submitted a brief for respondent.

Before McALLISTER, Chief Justice, and ROSSMAN, WARNER, O'CONNELL and HARRIS, Justices.

## O'CONNELL, J.

This is a habeas corpus proceeding brought by Morris Ettin to obtain the custody of Anna Marie Ettin, a minor child, who was and now is in the custody of the defendants who are the child's maternal aunt and uncle. Defendants have appealed from a decree of the trial court declaring the plaintiff is the natural father of Anna Marie and directing the defendants to deliver the custody of the child to plaintiff forthwith.

The defendants perfected their appeal and thereupon obtained an order of this court allowing them to retain custody of the child pending the appeal. The principal question in the case is the paternity of the child, the plaintiff contending that he is the father and the defendants contending that Ralph Titus is the father.

The facts relating to paternity are as follows. Ralph Titus and Lela Mae Titus were married in Casper, Wyoming on May 7, 1952. Soon thereafter they separated. In the latter part of 1953 plaintiff, who was separated from his wife, met Lela Mae in Las Vegas, Nevada when she was in the company of a man named Anderson. Lela Mae lived with plaintiff in his apartment for a short period of time and then left to return to the home of her parents, Mr. and Mrs. Rogers in Corvallis, Oregon in December, 1953. In January or February of 1954 she returned to Las Vegas, where she again lived with plaintiff and where

she and plaintiff held themselves out as husband and wife.

The child was born on January 6, 1955. On December 6, 1955, Lela Mae secured a decree of divorce from Ralph Titus and plaintiff secured a decree of divorce from his wife, Cecil Ettin. On the following day plaintiff and Lela Mae intermarried. Lela Mae died in Corvallis, Oregon on April 21, 1956. The child was then in the custody of Lela Mae's parents, Mr. and Mrs. Rogers. In July, 1956 the defendants took the child into their home where she has remained since that time. The defendants instituted adoption proceedings in January, 1957 and shortly thereafter plaintiff brought the present suit.

The plaintiff attempts to prove that Ralph Titus did not have access to Lela Mae during the period when the child was conceived, which, according to medical testimony, was sometime in mid-April, 1954. The defendants claim that in April, 1954 Lela Mae visited Ralph Titus in Roswell, New Mexico and there lived with him as husband and wife for a week or two. The evidence on this crucial point is in conflict. Ralph Titus was called as a witness for the defendants. He testified that he cohabited with Lela during the period beginning in March, 1954 and ending in July, 1954. According to his testimony she first visited him in Roswell, New Mexico in March "for a little while" and again in the middle part of April for about a week. Then, he claims, they met for a couple of days in the latter part of June, 1954 at Hobbs, New Mexico and on about July 1, 1954 they went to Carlsbad, New Mexico, where they stayed for several days. He dates their visit at Carlsbad by recalling that they went swimming there on July 4, 1954. He relates Lela Mae's visit at Roswell in March or April to a photograph of the

two of them standing at the foot of a rocky precipice which he claimed was taken at Roswell at that time. In a letter written by him to Lela Mae on July 18, 1954 he referred to the same photograph as one "where we are standing by the rocks on Casper Mts." Casper mountain is in Wyoming.

This is but one of several instances in which Ralph Titus' testimony is obviously false. Since his testimony is untrustworthy, we shall give it no probative force in support of his claim that Lela Mae visited him during the period in question. However, evidence was offered, which if received would establish that Lela Mae had visited Ralph Titus in April, 1954. The deposition of Mildred Hood, the owner and manager of the apartment house in Roswell, New Mexico, in which Ralph Titus lived from February 7, 1954 to May 3, 1954 was received under the rule after an objection to its admission was sustained. She testified that Ralph Titus introduced to her a woman as Lela Mae Titus, representing that she was his wife. From photographs of Lela Mae found in Ralph Titus' apartment after he had left, Mildred Hood identified Lela Mae as the woman to whom reference was made. Similar testimony was elicited by way of deposition from a cleaning woman who worked in the apartment house. These depositions were offered after the case had been continued. Plaintiff's counsel objected to their admission on the ground that they were immaterial; not within the purpose for which the continuation was allowed, and because they were deficient in the form in which they were taken. They were rejected by the trial judge without a statement of the grounds for exclusion.

We need not pass upon the question of admissibility of the depositions because we are of the opinion that

the testimony so taken, even if received, would not be sufficient to overcome the evidence that Lela Mae did not visit Ralph during the period from March, 1954 to August, 1954. That evidence is for the most part found in the letters written by Ralph to Lela Mae in June and July of 1954. These letters are clear and convincing proof that Ralph Titus did not see Lela Mae until well after the date of conception. One of these letters is dated June 28, 1954, and when introduced into evidence it was contained in an envelope postmarked Carlsbad, New Mexico, July 4, 1954. The letter read as follows:

> "June 28 - 54
> "107 1/2 N. Elm.
> "Carlsbad N Mexico

"Dearest Lela

"I am still trying kid—Maybe you have found another by this time.

"I am still thinking of you. Wish I could stop.

"I met some one over a year ago that begged me to wake up. I have already mentioned her name to you in letters.

"Now after its too late I have began to realize she may have been right.

"I havent written to her since last November 1953 You think I did away with your things.

"You also think all I do is tell you things that are untrue. You believe every one else.

"I rec. a wire when I was still in Casper from you or some one to send the trunks to an address in Arizona. I paid for the freight, that is Lenore loaned me the money. She & I took them to the depot & sent them to you.

"I am getting pretty much fed up with this kind of living. If you are going to be my wife, & help make a home let me see you do your part now.

"No man ever loved a woman as I have you, & still do, but maybe I am crazy to keep on hoping There is no use to destroy our lives in this way.

"Please be lady enough to tell me you are through & let me live like any other man that wants to do the right thing.

"I have given a lot more than I have rec. Now I am through. You either let me free to enjoy my life or come to me & make a respectfully [sic] home for us. I have forgotten all the past. Lela please. We are both human beings, not machines.

"I don't have the gift of gab & fictitious ways of making a lot of money I will work hard & be honest with all I meet I dont want any thing unless I earn it the right way.

"If you dont want that get rid of me, because I'm not the guy you want.

"as ever Yours,

"sending Love & hopes that you will be mine, and mine alone. please ans.

"Ralph Titus

"107 1/2 N. Elm, Carlsbad N. Mexico"

As already indicated, the postmark on this letter was July 4, 1954. Ralph Titus testified that he went swimming with Lela Mae on that date. If the letter was written on June 28, 1954, the day it was dated, then we have Ralph writing to Lela Mae when she was with him, and if we accept the postmark as the date of the mailing of the letter enclosed then we have him mailing a letter to her on the same day he so distinctly remembered going swimming with her. This improbability is not the point we wish to emphasize. It is, rather, the tone of the letter. It is not the letter of a man who has just been living with his wife.

We find next in the record a letter postmarked Carlsbad, New Mexico, July 6, 1954. The letter en-

closed is dated June 4, 1954. It is quite probable that the letter was mailed in another envelope. If that were so, Titus wrote to Lela Mae on June 4, 1954 and July 6, 1954. Again, the important fact is the contents of the letter indicating a long separation between the two people. The letter reads as follows:

"June-4-1954
"107 1/2 N. Elm
"Carlsbad New Mexico

"Dear-Lela-

"I have been thinking a lot about you. seems like you are allways on my mind.

"I was selling for a company out of Oakland California, but this fellow in Roswell couldn't pay me so I quit. he still owes me $1400.00 I have three checks on him $800.00 & $400.00 & $200.00. he doesn't have the money & also a big obligation to his family.

"Yes sure I am a big sucker to let him get me for that. but some day he may get on his feet. in the meantime I know I did my best.

"I cant do like a lot of others and besides this is only money

"I can make some more. but if I had some thing I worshiped & lost I would feel real bad.

"I have a good job here painting, getting $2.75 an hr. Working every day. I have 4 suits, lots of shirts & slacks a good 98 Oldsmobile that needs new tires. I'm getting them this week end.

"I have a real nice apt. every thing furnished only $57.50 a month, only myself. I am saving a few dollars each week. I dont owe only a few dollars, that I could get rid of in 2 weeks.

"I am a pretty darned good cook now.

"I am not satisfied or happy but I dont want to get acquainted and find I am holding the sack.

"Lela if I thought you & I could be happy to-

gether & forget the past I would be with you so quick it wouldn,'t be funny.

"I dont think I should feel bad Maybe I'm wrong in thinking this way. I dont want to hurt any one. the more I can do to help others the better I feel. can you understand my feelings in that way. I would much rather be alone & not hurt any one than to have my own satisfaction & hurt others.

"life is pretty short. the years pass by fast, but the days & nights are long & lonesome.

"It is these Long lonesome times spent alone that makes it worse, every thing seems to be muddled up.

"Love is a funny thing & the worst type of illness if one is alone in Loving some one that doesn't Love the same way.

"I tried darned hard to do the right thing. but some one else that was care free & taking what belonged to others seemed to get what they set forth to get.

"I'm still pretty much mixed up. I cant put on paper what is in my heart.

"I guess thats my failure in not being able to tell & show how I feel inside.

"Well I must close write to me please. Happy birthday Honey I hope you are realy happy.

"Well my address is

"Ralph Titus
"107 1/2 North Elm
"Carlsbad New Mexico"

Then we find another letter written to Lela Mae by Ralph on July 18, 1954. This letter is also postmarked Carlsbad, July 19, 1954. It reads:

"July -18-54
"Bataan Apts. #9
"510 W. Green st.
"Carlsbad N. Mex.

"Dearest Lela.

"I have moved to another apt. I have had my name in for one of these for some time & I finaly got a nice place.

"Now it looks as I may leave here, because of the scarcety of work.

"The steel work isn't ready yet & maybe not for another 3 or 4 weeks I have a couple of weeks yet where I'm at. I didn't work one week thats because the one I was on ended.

"I rec. a letter from The Raynard & Logan paint co. in Billings Montana they want me to come up there & work. they have lots of work that will last as long as I want to stay. I like Billings & think I would like to live there.

"the scale for wages are $2.40 per. hr.

"There is a big Government project going on in Colorado Springs Colorado that will last for about 5 yrs. lots of over time. I have first chance at that, too.

"I can find work easy enough, but this living alone & hitting first one place & another is getting pretty tiresome.

"I wanted to be with you so bad. I sure hoped I would hear from you before this. I know there is a project at Las Vegas out about 10 or 15 miles also the scale is $2.65 per. hr. I guess I wanted to hear you say it & thot you wanted me also. But I guess I expected too much.

"I am boiling a chicken going to make myself some chicken & noodels.

"I hope they are good.

"You were asking about how I was. I think I am a little heavier than when you last saw me. I also have dental teeth. I sure dont look like my old self. I have a very nice set. I have a good tan. been out in the sun a lot & swimming a lot too.

"doing a little dancing once a week.

"I am going with a lady here. she is a Texas queen tall, brown eyes & auborn hair dark complexion. Irish & Indian quite pretty.

"She has been married before & has 3 children. she is 26 yrs old. her husband ran away with another gal. 16 yrs old he is in the pen.

"her father has a big ranch in Texas. raises cotton & cattle. he has 2 oil wells on his farm.

"pretty much of a guy. her mother reminds me a lot of our Mom Rogers. talks like she does.

"I sure could get set up there.

"funny how fate controls ones life & Love.

"I am like you only this lady is not married. & she thinks I am a pretty square guy. I told her I was married & showed her your picture. the one where we are standing by the rocks on Casper Mts. the one we had enlarged. she doesn't blame me for loving you & she understands.

"I cant even bring myself to kiss her. We talk some about what I am going to do with my life & I dont even know how it will turn out myself.

"I've told her I'm in Love with a girl & married to her. she doesn't know but what you are an independant carrear [sic] girl & made the mistake of marrying me.

"I wonder maybe that may be it. you are very intelagent [sic], beautiful, & sweet. darling some times I think I am going crazy thinking about you.

"I sure wish I didn't care so darned much.

"Maybe I could do some thing about my own welfare & happiness. it sure is a curse to Love some one this way & not be able to do a thing about it.

"I have been around a lot hoping I could shake the feeling, but its no use. I guess I'll just have to get immune to heart aches some way.

"Well Lela I am closing not knowing where I'm

going to be after another month. I'll have to wait untill [sic] I get there & then write & if dont get there then of course I wont be able to write. not caring much either way.

"Longingly yours.

"Ralph."

The contents of these letters convince us that Ralph Titus, when writing them, had not seen his wife for a substantial period of time. His reference to his weight; to his "dental teeth" which he had worn since 1953; to his association with another woman; to his wardrobe, automobile, and the manner in which he was living; to his desire for reconciliation, all signify a long separation from his wife. Very probably because of these letters Lela Mae went to visit Ralph on August 20, 1954. On June 29, 1954 she wrote to her sister, saying:

"* * * * *

"Wrote Ralph a letter today so wouldn't mail his until I had written to you. As I felt guilty ha! ha! he wished me a happy Birthday and wrote a very nice letter which I was glad to get. I guess I am just lonesome Alice & I can't help it. Will try & do differently about writing and please forgive me for neglecting you.

"Give my regards to all. hope little Janice is well.

"Will close & get this in the mail tonight. I told Mom that I would mail hers Sat. & didn't have the stamp so didn't get it off until Mon as I had written Spec. Del. on it so couldn't get one at the drug store. I have a stamp for this one so can drop it off.

"All my love,
"Lela"

And then on September 9, 1954 she wrote to her mother and father as follows:

"Sept 9 1954

"Dearest Dad and Mother

"I was in Amarillo Texas got there on the 20th of Aug. I told Morrie before I left I had a letter comming [sic] from you and Mother & it would probably be registered I didn't say why but he told me to call him and reverse the charges as soon as I got there and let him know how the trip was and he would tell the man at the Post office I was in Amarillo & have the letter sent on from there which he did.

"Dad I went down there for a purpose & that was to get things straightened out with Ralph and I was very much surprised when Dad mentioned me going back to Ralph All I had to do was see him again & wasn't quite a week he's still as phoney as ever & I don't believe anything he tells me I called him a liar to his face & I'll never get my trunks. he is practically clothless and this car he has now is bashed in and no left light and the front of it looks like the Hudson car I decribed [sic] to you when I was in Casper. Anyway Mother & Dad after I was away from Morrie for awhile he really meant something to me as I didn't realize & also he felt the same. Ralph had made the remark before to you & Mom, when Lela comes to her senses which I guess I did, really found myself and I know that Morrie is the man for me. We are both trying to get straightened out Morries divorce should be final & I have applied for mine. Ralph tried to tell me he would contest it but I told him it wouldn't do him a bit of good as I would fight right back that when I was so sick and he knew it but never contributed any money to my support & I also told Ralph that Morrie is the only man I would ever work for in case he ever got sick because he's done so much for me. Ralph couldn't take it, whent [sic]

out & got drunk & when I saw him he was weaving back & forth with the bottle and said I thought I had you fooled but I see you are too smart for me. he says I am the same person haven't changed too much except I am hard, who wouldn't be Mom after I went through with what I have.

"Morrie and I are talking about a little honeymoon going to Lake Tahoe and on through to San Francisco. I have never liked it here the weather I have hated thats probably why I have acted like I have we may have the furniture shipped down from here to Frisco and he has written to a couple of Brokers about a couple of business places small resturant [sic] to get a start.

"* * * * *

"Love to All,
"Lela"

"* * * * *

From this letter it would appear that the visit which Lela Mae was reporting was not the last of a series of such visits, as defendants contend, but an isolated event.

There is no doubt that Lela Mae and the plaintiff lived together as husband and wife in Las Vegas beginning in February, 1954 soon after Lela Mae had returned from her Christmas visit at the home of her parents in Corvallis, Oregon. Her mother testified that after the Christmas holiday Lela Mae left for San Francisco where she called her mother upon arrival and that from San Francisco Lela Mae went directly to Las Vegas. The mother and daughter corresponded with each other thereafter, Lela Mae's letters being mailed from Las Vegas. This was during the period when Ralph Titus claimed that she was in New Mexico. The depositions of a dentist and a doctor in Las Vegas show that Lela Mae received

dental or medical attention there on February 26; March 1, 17, 20, 22, 24, 27, 29, 31; April 3, 6, 20; May 24; June 15, 30 and July 15. A letter dated March 10 and postmarked March 11, 1954 at Las Vegas was written by Lela Mae to her mother. It would have been possible for Lela Mae to have travelled the round trip distance of approximately 400 miles between Las Vegas and Roswell during the intervals between the foregoing dates, but it does not seem probable that she did considering the fact that she was undergoing a course of medical and dental treatment calling for her presence in Las Vegas during that time. There is other evidence which could be pointed to in support of our conclusion that Ralph Titus and Lela Mae were not together during the critical period in March or April, 1954.

■ The trial court, apparently proceeding upon the assumption that the issue presented was paternity rather than legitimacy, decided that the plaintiff had only the burden of proving his paternity by a preponderance of the evidence. The defendants argue that the issue is legitimacy and that the plaintiff must establish his case by clear and convincing evidence, proving that Ralph Titus did not have access to Lela Mae at the time the child was conceived. *In re Rowe's Estate,* 172 Or 293, 141 P2d 832 (1943). It is not necessary to determine whether the facts of this case present an issue of legitimacy or an issue of paternity, see Annotation: Presumption of legitimacy or an issue of paternity, of child conceived or born before marriage, 57 ALR2d 729 (1958), because even though legitimacy is regarded as the issue, we think that the evidence adduced by the plaintiff clearly and convincingly establishes nonaccess and, therefore, plaintiff has carried his burden of proof.

As pointed out by Justice Cardozo in *In re Findlay*, 253 NY 1, 170 NE 471, 473 (1930), "countervailing evidence may shatter the presumption [of legitimacy] though the possibility of access is not susceptible of exclusion to the point of utter demonstration." Issue "will not be held legitimate by a sacrifice of probabilities in a futile quest for certainty. * * * The presumption does not consecrate as truth the extravagantly improbable, which may be one, for ends juridical, with the indubitably false. Cf. *Matter of Case*, 214 N.Y. 199, 204, 108 N.E. 408." The court goes on to show that in the adjudicated cases the presumption has been overcome "though there was a possibility of meetings between the separated spouses." See: *State v. Soyka*, 181 Minn 533, 233 NW 300 (1930). There is the possibility in the case at bar that Ralph Titus and Lela Mae met as the defendants contend, but in the light of the evidence this possibility is so remote that we may disregard it in determining whether plaintiff has met his burden of proof.

The record contains photographs of the child and of Ralph Titus and Morris Ettin, the plaintiff. We think that there is a resemblance between the child and the plaintiff. The trial judge saw these three persons and it is quite possible that his conclusion was in part based upon that resemblance.

■ We have concluded that the evidence establishes that plaintiff is the father of Anna Marie Ettin. It does not follow that he is entitled to the custody of the child. The defendants' return to plaintiff's petition for a writ of habeas corpus raised the issue of the plaintiff's fitness to have the care, custody and control of the child. The trial judge regarded the proceeding as one limited to the determination of the paternity of the child and for that reason evidence offered by

defendants purporting to show plaintiff's unfitness to have custody was excluded. The trial court should have received the evidence relating to the plaintiff's fitness. That issue, if raised, can be litigated in habeas corpus proceedings. *Langenberg v. Steen,* 213 Or 150, 322 P2d 1087 (1958); *Armstrong v. Vancil,* 169 Or 320, 128 P2d 951 (1942); *Ex Parte Bowers,* 78 Or 390, 153 P 412 (1915); *Barnes v. Long,* 54 Or 548, 104 P 296 (1909). Cf. *Quinn v. Hanks,* 192 Or 254, 233 P2d 767 (1951); *Bartlett v. Bartlett,* 175 Or 215, 152 P2d 402 (1944). If the trial court had considered the evidence on the issue of fitness it is possible that it might have found that plaintiff was unfit. *Bryant v. Dukehart,* 106 Or 359, 210 P 454 (1923). The cause, therefore, must be remanded to determine this question of fitness.

Remanded for further proceedings.

HARRIS, J. (Pro Tempore), concurring in part and dissenting in part.

I concur in the opinion of the court that the evidence establishes that plaintiff is the father of Anna Marie Ettin. However, I dissent from that portion of the opinion remanding the cause for the determination of the issue of fitness of the plaintiff. This is an appeal in which the trial is de novo in this court. The issue of fitness is fully presented in the appellate record and the briefs, and this court, in my opinion, should make a final determination of this issue, as well as any other issue properly contested in the cause. This, in my opinion, is our obligation in all causes tried de novo in this court.